Atchison, Topeka & Santa Fe Railway Company v. Madden,
Sykes & Company.

Decided June 1, 1907.

**1.—Railroads—Floods—Tradition, Competent Evidence.**

It is the duty of railroad companies in the construction of their tracks
to inform themselves of the history and traditions concerning the streams ad-
jacent thereto and the floods in such streams, and to construct their tracks
accordingly. In a suit for damages to freight by flood while in the yards
of a railroad, testimony as to traditions of former floods, as great as the one
in question, is not incompetent on the ground that it is hearsay.

**2.—Same—Damage to Freight—Negligence—Evidence.**

In a suit for damage by flood to a shipment of goods in the railroad yards
at Kansas City, evidence considered, and held sufficient to support a finding
that the railroad company was guilty of negligence in the location and con-
struction of its tracks, and in failing to heed warnings of an approaching
flood, and in not removing the cars containing the goods, to a place of safety.

Appeal from the District Court of Cooke County. Tried below
before Hon. D. E. Barrett.

*J. W. Terry* and *A. H. Culwell,* for appellant. The court erred
in overruling defendant's motion for a new trial on the ground
that the verdict was against the law and the evidence. Interna-
tional & G. N. Ry. Co. v. Bergman, 64 S. W. Rep., 999; Hunt
Bros. v. M. K. & T. Ry. Co., 74 S. W. Rep., 69; Gulf C. & S. F.
Ry. Co. v. Darby & Cauthen, 67 S. W. Rep., 129; Gulf C. & S.
F. Ry. Co. v. North Texas Grain Co., 74 S. W. Rep., 567; Galves-
ton H. & N. Ry. Co. v. Mistrot Bros., 68 S. W. Rep., 1117.

*Davis & Thompson,* for appellees.

CONNER, CHIEF JUSTICE.—Appellees instituted this suit in the
District Court to recover the value of certain merchandise alleged
to have been shipped from Chicago over the line of appellant's road
and destined to Ardmore, I. T., and which, it was alleged, had
never been delivered. Appellant answered by general demurrer,
general denial, and especially that if said goods were delivered to
appellant and thereafter lost, the loss was not occasioned by its
negligence, but said goods had been injured and destroyed in a
flood of the Kaw and Missouri rivers at Kansas City, Missouri,
which submerged the cars in which the goods were contained; that
this flood was unexpected and unprecedented and an act of God
that could not have been provided against. There was a trial before
a jury which resulted in a verdict and judgment in favor of
appellees for the sum of eleven hundred and five dollars, from which
judgment this appeal has been prosecuted.

The evidence shows that appellees' merchandise was delivered to
appellant, as alleged, and by appellant transported from Chicago
as far as Kansas City. The cars in which the merchandise was

shipped were placed by appellant in its yards at the last named
city. The first car arrived at 3:15 p. m., May 28, 1903; the second
car arrived at 3:15 a. m., of the 29th day of said May; and the third
car arrived at Kansas City at 8:15 p. m., on May 29. The flood
had been growing since about the middle of May, and on the
night of May 29 the Kaw river got out of its banks and the flood
reached its height May 31 and June 1, when it attained a stage
of from twelve to fifteen feet over appellant's yards at Kansas City
and appellees' goods were thereby rendered substantially worthless.
On the night of May 29 appellant had all of its west bound
business made up into trains with engines attached and crews on
duty ready to depart from its yards, when it was ascertained that ·
the water had overflowed the track at Holiday, Kansas, which is
west of Kansas City, to such an extent that trains could not pass
through. The crews were thereupon released and the engines sent to
the engine house. On May 30, appellant with all the means at its
command began to move the cars in its yards to higher ground and
continued to so do until the water put out the fire in its engines
and stopped them from working. The officer in charge of the
United States Weather Bureau at Kansas City testified that he
issued daily bulletins containing gauge readings at points on the
Missouri River, with comments on anticipated flood in the shape of
warnings; that the bulletins were furnished to newspapers and the
public generally and were issued from May 26 until after the flood
subsided; that on May 30 and 31, 1903, very few reports were sent
out by mail because of the fact that telegraphic facilities for gath-
ering news had been greatly impaired and train service was crippled.
On May 26 the following warning was issued; "Owing to the fre-
quent heavy rains in the Kaw and Middle Missouri valleys, the
rivers will continue rising at Kansas City. Should the rains keep
up a few days longer the danger line will be reached at Kansas City."
On May 27 the following warning was issued: "The great volume
of water resulting from the recent storms between Kansas City and
Sioux City and in the Kaw valley has raised the Missouri beyond
the danger line at Kansas City, the reading at 7 a. m. being 21.7
while Sioux City and Omaha report falling stages. Reports of
very high water in the Kaw river, added to a prospect of more rain
in this section within the next twenty-four hours, suggest that
interests affected by high water should be closely guarded." On May
29, 1903, the following warning was issued: "The Missouri river
stage 23.3 feet at Kansas City this morning, 2.3 above danger line.
Excessive rains for past twenty-four hours in Kaw valley and light
to moderate rains throughout basin. Both Missouri and Kaw rivers
will continue rising. The flood in Kaw may become very serious
without additional rains liable to fall today and tonight. It may.
go two or three feet higher within the next thirty-six hours." This
witness further testified that no estimate had been placed on the
ultimate height that the flood would reach, but that it reached
the "danger line" on May 28, the stage on that morning measuring
21.7 feet. It appears that appellant's line or road extends up the
Kaw river to Topeka, some sixty miles, but that no flood, save that

hereinafter mentioned, of previous years nad, been sufficient to submerge cars in appellant's yards at Kansas City.

Octave Chanute, however, one of appellant's witnesses, testified upon his cross-examination that "about the time that I, as chief engineer, built the Kansas City bridge, I investigated the history of the floods, and I ascertained that the flood of 1844 reached the stage of thirty-seven feet above dead low water, and that no other flood had approached it, save one preserved by tradition among the Indians, which occurred probably in 1785. I concluded that it was not imprudent to take the chance on a flood which could only result from combined simultaneous floods in the Missouri, the Platte, and the Kaw,—a combination which occurred once in fifty-nine years. Singularly enough, there was no other such flood after 1844 until 1903, until fifty-nine years afterwards. The A., T. & S. F. Railway Company has a bridge across the Missouri river at Sibley, some twenty miles below Kansas City. I located and built that too. I placed the lower cords some fifty feet above the high water mark of 1844 in order to clear steamboat chimneys and thus dispense with a draw span."

James Dun, one of appellant's witnesses, testified that he was chief engineer of appellant's system, and that appellant had a bridge across the Missouri River at Sibley, about twenty-eight miles below Kansas City, which is much higher above low water mark than the switch yards at Kansas City; that it was built high enough to clear the stacks of steamboats passing under a high water mark of 1844, this height being required by the United States Government to avoid building a draw span.

W. J. Scott testified to the effect that he had seen the high water mark of the flood of 1844 on the Hannibal bridge at Kansas City, and that the marks of the flood of 1903 were higher than those of any other flood there except that of 1844, which was six or eight feet higher than that of 1903.

It was also shown that some twelve or fifteen other railway companies had terminals in the bottom where appellant's terminals were located, and there was evidence to the effect that no other practical place convenient to Kansas City, other than this bottom, existed, but it was proven that no levies or other means had been provided to protect the terminals from inundations of the character of that in question.

Appellant insists, on the ground that it was hearsay, that the evidence of the flood of 1844 and of the traditional one of 1785 was incompetent, and that therefore the court erred, as assigned, in admitting it. But we think we must approve the action of the trial court in admitting this testimony. As a carrier, appellant was an *insurer* and can only be relieved from liability on the ground that the flood destroying appellees' merchandise was not to be anticipated—an act of God, as those terms are technically used—and in bridging streams crossed by its line of railway and in locating its terminals it was certainly the duty of its engineers and locating agents to learn the history of such streams, so as to provide against damage from floods that might reasonably be anticipated. History consists largely, if not wholly, of the records, narratives and statements of others,

purely hearsay, and if the history of a stream be such that therefrom floods of a given height may reasonably be anticipated, then such floods must be provided against. In such cases the vital question is not so much what was the height of a flood or floods spoken of in the history of the stream, but the question is, should a flood, such as the one in controversy be reasonably anticipated in the light of the history? It appears in the evidence of this case that the high water mark of the flood of 1844 was well known to the chief engineer of the appellant's system of railway. He testified that one of appellant's bridges—that at Sibley, below Kansas City—had been built with reference to this mark, as required by the government. A well authenticated record of this flood must, therefore, have been kept by the government. Such high water mark was also shown on the Hannibal bridge in the immediate vicinity of the flood in question. The witness Chanute's testimony, which has been quoted in part, shows that in the performance of his duty as a chief engineer, he investigated the history of the floods at Kansas City and that he then learned of the flood of 1844 and of the tradition among the Indians of one which occurred probably in 1785. We think the requirements of the government in building bridges, the high water mark actually made upon the bridges, and the tradition spoken of, all admissible on the issue of whether a flood of the character of the one in controversy might reasonably have been anticipated by appellant. It is not pretended that there is any uncertainty as to the fact of the government requirement stated, or as to the markings of the high water mark on the bridges, as stated, or as to the fact that there was an Indian tradition, as stated, and we think these circumstances at least tended to show that at the time of the location of appellant's terminals at Kansas City a flood of the character of the one in controversy could and should reasonably have been anticipated. In Gulf, C. & S. F. Ry. Co. v. Pomeroy, 67 Texas, 501, it is said, in effect, that even extraordinary floods if they be such as may reasonably be anticipated must be guarded against without reference to the infrequency of their occurrence. The fact that floods not provided for have occurred only at long intervals, constitutes no defense.

It is also insisted that the evidence fails to sustain the verdict and judgment. We have already indicated that we think the evidence possibly sufficient to sustain a finding that the flood in question was one that should have been anticipated, and whether it was or not we think it sufficient to sustain a finding that appellant was guilty of negligence in depositing appellees' goods in its yards at Kansas City at the time it did in view of the history of the stream and of the warnings sent out by the weather bureau and other evidence hereinbefore recited. The court's charge submitted both of the issues above indicated and the charge, we think, is not subject to the objection made thereto that it is upon the weight of the testimony. This case in all substantial respects is a companion case to that of this same appellant versus Madden, Jarrell & Company, from the County Court of Cooke County and decided by us on June 9, 1906. In that case, in an unpublished opinion and upon substantially the

same state of facts as herein detailed, we adopted the trial court's findings, which are to the effect that the appellant was therein guilty of negligence in not having provided against the flood of 1903, and in transporting goods into the yards at Kansas City after traffic had been suspended west of that point and after the extent and magnitude of the prospective flood could and should have been anticipated.

We conclude that the judgment herein should be affirmed, and it is so ordered.

*Affirmed.*

Writ of error refused.