GALVESTON, H. & S. A. RY. CO. v. VOGT.
(No. 5522.)

(Court of Civil Appeals of Texas. San Antonio.
Jan. 5, 1916.)

1. WATERS AND WATER COURSES ⬤⟶119—OBSTRUCTION—RIGHT OF WAY—"ACT OF GOD."

A flood not shown to have been higher than previous floods, but which plaintiff claimed injured his premises because the defendant railroad company had partially filled in trestles of a dirt embankment causing the water to back up, is not an act of God excusing the railroad company from liability.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 131–134; Dec. Dig. ⬤⟶119.

For other definitions, see Words and Phrases, First and Second Series, Act of God.]

2. WATERS AND WATER COURSES ⬤⟶126—OBSTRUCTION—RIGHT OF WAY—DAMAGES.

In an action against a railroad company for destruction of plaintiff's crops which he claimed resulted from an embankment partially filling railroad trestles, which caused flood waters to back up and inundate his land, evidence *held* insufficient to show that the fill caused the damage.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 139, 141, 142; Dec. Dig. ⬤⟶126.]

3. WATERS AND WATER COURSES ⬤⟶125—VERDICT—CONJECTURE.

Where plaintiff's crops would have been inundated in any event, but fills under a railroad trestle caused the waters to stand longer on plaintiff's land, an award for destruction of crops cannot stand, being based on pure speculation, there being nothing to show what part of the damage resulted from the fills holding the water.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 140; Dec. Dig. ⬤⟶125.]

4. EVIDENCE ⬤⟶472—OPINION EVIDENCE—CONCLUSION.

Where plaintiff claimed that fills under a railroad trestle prolonged the inundation of his farm and resulted in the destruction of his crops, testimony that the water on plaintiff's land was backwater, is admissible, but the witness can-

not testify that such backwater was caused by the fills, that being a question for the jury.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2186–2195, 2248; Dec. Dig. ⬤⟶472.]

5. TRIAL ⬤⟶85—OBJECTIONS—SUFFICIENCY.

Where part of the answer was admissible, the overruling of an objection to the entire answer was not error, but part of it was improper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222, 223–225; Dec. Dig. ⬤⟶85.]

6. EVIDENCE ⬤⟶472—OPINION EVIDENCE.

Where it was claimed that fills under railroad trestles caused flood waters to back up and inundate plaintiff's land, testimony that the water was higher on the upper side of the fills than it was on the lower, is not subject to objection that the witnesses attributed the depth of water solely to the fills.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2186–2195, 2248; Dec. Dig. ⬤⟶472.]

7. APPEAL AND ERROR ⬤⟶1048—REVIEW —HARMLESS ERROR.

Where the witness had already testified to a fact assumed in a question, the assumption is harmless error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4140–4145, 4151, 4158–4160; Dec. Dig. ⬤⟶1048.]

8. EVIDENCE ⬤⟶471 — OPINION EVIDENCE — CONCLUSIONS.

Where plaintiff's land was inundated by flood waters and fills under the railroad trestles retarded the escape of the waters, testimony that plaintiff would have lost only part of his crops had there been no fills, is improperly received, being a conclusion of the witness on a matter for determination by the jury.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. ⬤⟶471; Witnesses, Cent. Dig. §§ 833–836.]

9. TRIAL ⬤⟶252—INSTRUCTIONS—REFUSAL.

Where it was claimed that fills under a railroad embankment caused waters to back up, prolonging the inundation of plaintiff's land, and there was no evidence showing other obstructions; which caused the backing up of the water, the refusal of a charge requiring a verdict for defendant if the jury should be unable to determine what portion of the damages was caused by defendant's fills and what part by other obstructions, is proper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. ⬤⟶252.]

Appeal from District Court, Victoria County; John M. Green, Judge.

Action by Herman Vogt against the Galveston, Harrisburg & San Antonio Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

Baker, Botts, Parker & Garwood, of Houston, and Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellant. Fly & Ragsdale, of Victoria, for appellee.

MOURSUND, J. Appellee, Vogt, sued appellant to recover $3,000 as damages for the destruction of certain crops of corn and cotton in the field and certain farm products gathered, alleging that such damages were occasioned by negligence on appellant's part in partially filling in certain trestles with a dirt embankment, which Vogt contended caus-

ed a certain overflow of the Guadalupe river to inundate his premises on October 5, 1913. Plaintiff alleged that the overflow was not unprecedented nor of greater magnitude than ordinary in previous years, but that if it was unprecedented the waters would still not have reached his land and crops had it not been for defendant's obstruction of the natural and ordinary passageways; that if the waters had reached his crops only a small amount of his produce would have been destroyed, and of nominal value; that in any event the damming up of said passageways under said trestles prolonged the inundation of plaintiff's crops, and in the absence of said obstructions the crops would not have been destroyed or damaged. The damages to the crop are fully set out. The petition is lengthy, but the above statement is sufficient to show what the issues were.

Defendant by its answer put plaintiff upon proof as to every essential allegation of his petition, and pleaded specially that the damages were in no manner caused by any act of negligence of defendant, but were caused solely by an act of God, in that the overflow of the Guadalupe river, which caused the same, was unprecedented and so great and sudden that it could not be expected or guarded against; that the flood continued for many days and maintained its highest point for several days; that the extent of the openings under the trestles did not contribute to cause the overflow of plaintiff's land, because when the overflow water reached said trestles plaintiff's land and crops were already overflowed to a great depth; that when the flood reached said trestles the earth which had been placed thereunder began to crumble away, and within a few hours all of same had been practically washed away, and, notwithstanding that fact, the flood continued to rise on both sides of the track to a great height, of such depth as to entirely overflow the crops on the upper side of the track, including that of plaintiff, and the lands and crops on the lower side of the track; that after said earth had been so washed out the overflow on the upper side of the trestles was of great depth over the entire western valley of the river, and was standing at a great depth over appellee's land, wholly overflowing his crop, and continued at said height for several days before the water began to recede; that the water receded slowly, and after it began to recede stood at great depth for several days entirely submerging plaintiff's crops; that the damage to appellee's crops would have occurred whether the trestles had been partially filled in or not. Defendant also pleaded fully in regard to a subsequent flood which took place in December, 1913, and at a time when the earth had not been replaced under the trestles, with the view apparently that such pleadings were necessary to admit evidence of the comparative extent, depth, and effect of the two floods; such evidence going to the issue whether plaintiff's crops would have been entirely overflowed and destroyed by the October flood had the earth dump not been placed under the trestles.

By supplemental petition plaintiff denied all the material allegations of the special pleas of defendant.

The trial resulted in a verdict and judgment in favor of plaintiff for $1,208.15, with interest at 6 per cent. per annum from October 6, 1913, to date.

The evidence shows that the Guadalupe river flows in a southerly direction through Victoria county, and that the city of Victoria is situated on the east bank thereof; that the valley of the river on the west side and opposite the city of Victoria is about 2½ miles wide for 3 or 4 miles above and below the city; that in such territory the western banks of the river are higher than the western portion of the valley near the foot hills; that when the floods are so great as to fill and overflow the bed of the river the water runs out into the western valley at the Power levee, which is about 3 or 4 miles above the trestles, at the Smith place, right below the Power levee, at the Marshall place, which is about a mile above the trestles, at the Mitchell place and at the Wilden place, about 150 yards above the Guadalupe bridge. There is a bayou or slough leading from the Marshall levee down towards the trestles, which runs through the Randall 40-acre tract, the Urban tract, the Webber tract, on which Vogt had part of his crops, then into the Newton Dudley tract and strikes the gravel road about 500 yards above and west of the Poindexter trestle. When it crosses the road it loses its identity as a slough or bayou, the ground being level and the topography such as to cause the water to divide, and part to go through the Poindexter trestle while the other part goes through the Goldman trestle. At the place where such slough strikes the road it is about 40 feet wide and its banks about 5 feet high. La Nue testified to a width of 40 feet and banks 7 feet high at one place, but did not make clear at what place.

There is also a swag through the Joe Urban and Cash Jones fields, which ends at the Poindexter trestle. The water from the Power levee, which is situated almost due north of the trestles, finds its way through a slough in the western part of the valley, running through the Sloan, the Casten, the Conti, the Bianchi, and the Goldman tracts. The water from this slough joins that from the Marshall place before the trestles are reached and flows through both trestles.

The two trestles are designated by the railroad company as 93–E and 93–H, but are commonly known as the Poindexter and Goldman trestles. The Poindexter trestle (93–E) is about 1½ miles west of the railroad bridge across the Guadalupe river leading into the city of Victoria, while the Goldman trestle is between a quarter and a half mile west of

the Poindexter trestle. The two trestles are joined together by a dirt embankment. The Poindexter trestle is about 810 feet long, and the other one 900 feet. Earth was dumped in under said trestles at both sides until only 150 feet of open space remained under each. After the October flood, the Poindexter trestle had 183 feet of earth fill left, and the other one had 70 feet of fill left under it. The land is level where the trestles are.

The statement of facts is unnecessarily long. Much irrelevant testimony was introduced by defendant over plaintiff's protest, relating to flood conditions at such distance from Victoria as to cast no light upon the extent and duration of the flood at that place. We shall briefly state testimony which bears most directly upon the questions of fact involved.

The testimony supports a finding that in 1869 there was an overflow considerably greater than that of October, 1913, which inundated the valley where the trestles are situated to a greater extent than occurred in October, 1913; that in 1889 and in 1900 and 1903 there were overflows of about the same magnitude as the one in October, 1913. Two witnesses testified that the 1889 overflow was probably a little higher than the one in October, 1913. The testimony shows that during these overflows the water came down into the valley where the trestles are situated and inundated such valley.

There is testimony by several witnesses that on Sunday afternoon, October 5, 1913, the water on the north side of the dump came a great deal higher on the dump and trestles than on the south side, the greatest difference being testified to by the witness Markham, who placed it at 5 or 6 feet. Herman Goldman estimated it at 5 feet, or more, and testified that it came within less than 2 feet of the top of the embankment on the upper side. The distance from the ground to the trestles was about 12 feet. The testimony shows that in the afternoon of October 5th the dump washed away to such an extent as to materially decrease the difference in height between the water above and below the dump. The dump caved in and washed away in large chunks that afternoon, but the exact extent cannot be determined from the testimony. The witness Mitchell testified that about two-thirds of the fill at the east end of the Poindexter dump had washed away between 4 and 5 o'clock, when he took the picture marked Exhibit F. This picture shows that a large part of the fill had washed away. His testimony on this point is not disputed. His testimony with regard to the other portions of the fills is as vague as that of the other witnesses. Johnston testified that he viewed the water flowing through the Goldman trestle from about 10 o'clock Sunday morning until 4 or 5 in the afternoon; that it got deeper and deeper until it rose over the road; that the gravel road and railroad dump held it back; that when the wa-

ter got 5 or 6 feet deep the fill began to wash away at both ends of the Goldman trestle, and washed away more and more; that when he left whole chunks would go out. The height of the gravel road is not testified to. County Judge Pool testified it was purposely left low so as to offer little resistance to overflows. He testified that during the October overflow most of it was washed out 2 to 3 feet deep. Herman Goldman testified that the fill gave way about 3 o'clock; later he said it gave way towards evening. On cross-examination he again placed the time at 3 o'clock. Seiler testified that the dirt was washing out Sunday afternoon, and when he returned the next morning most of it had washed away. Marklin testified that he was on the wagon road at about 2 o'clock Sunday afternoon, and then saw a big bulk, about 30 feet, of the dump wash out at one time; that it went more while he was on the wagon road than it did at about 3 or 4 o'clock, at which time he viewed the flood from the railroad dump, but now and then a chunk would go during all the time he was there; at the time he left, lots of the dirt on both sides of the opening under the trestle was gone. Helpesky testified that the dump began to wash away before he got to the Goldman trestle Sunday at a little before 11 a. m.; that it continued to wash away in great quantities while he was there; that he left at 3 p. m., or later. He did not think practically all of it had washed away by the time he left; that he went to the Poindexter trestle on Tuesday, at which time the water was probably a foot higher on the north side of the dump than on the south side; that the dump was still washing out. Jaynes, in behalf of defendant, testified that the fill on the Goldman side washed out pretty rapidly; that when he left at about 6 p. m. there were several "bents" left; that a bent was about 15 feet. He also testified that on Monday morning there were four or five "bents" left on the Goldman end of the trestle. Lipske testified the fill was giving way at 2 or 3 o'clock Sunday when he arrived, and was still giving way when he left at about 6 o'clock; that the difference in height of water above and below the track was about the same Sunday and Monday, his estimate thereof being from 6 inches to 1 foot. Triplett testified that he went out to the dump after 3 p. m. Sunday, and the dirt, as far as it did wash out, was practically all gone before he got there. The testimony fails to show with certainty when the flood reached its greatest height at the trestles.

Johnston testified the water began falling before he left; that it had fallen on the upper side and risen below. H. Goldman testified the water above the track began to fall when the fill gave way, and in two or three hours it began to get level with that below the trestle; that in an hour and a half after the fill gave way the water began to recede on the north side of the embankment. He

did not go back to the trestle that evening. Ernst testified the water came up higher all Sunday evening on the upper side of the track; that about 6 o'clock on Sunday afternoon it came within 2 inches of flowing over Fiek's doorsill; that during Monday night it fell a little, a "couple of inches or a foot"; that at Fiek's store it had not fallen much, but at witness' house, which was near Vogt's house and on the same tract, it had fallen about a foot. Joe Urban testified the valley was full of water from the river west to the hills at 12 noon on Sunday, there being some land out next to the river bank; that the overflow continued until Monday and Tuesday, and then began falling; that it began falling on Monday; that on Sunday and Monday it was deep over the Vogt land; that the water covered Vogt's land entirely on Monday. Seiler testified the water had fallen about 2 feet at his place Monday morning. His place is north of the track near Vogt's, a little east of Vogt's, and across the gravel road which forks right after passing Vogt's. He also testified that the water began to rise some, late Sunday afternoon. He left at about "6 o'clock or dark." Geo. Goldman testified he thought the water kept getting higher until about 4 p. m. on Sunday; that the water was about 8 to 10 feet deep over the valley at about 11 or 12 o'clock; that "in the low places in the land he supposed it got over 6 or 7 feet." He did not testify how long he stayed at the trestle. Plaintiff, Vogt, testified:

"It was Sunday afternoon it got to rising. The water rose up to Monday morning and then began going down; it had gone down some early Monday morning. This corn I have testified about was torn out of the field by this terrible eddy that came there between Sunday night and Monday. I could not say whether it was Sunday night or Monday morning, but it was during that time it knocked it all down; when the water got its force it pulled it all down, but I could not tell you the exact minute."

Malitz testified, in behalf of defendant, that he and Weisiger went in an automobile to Fiek's on Monday or Tuesday about 6 p. m., passing through water flowing over the road, and when they arrived at Fiek's they would have had to wade to the house, had there not been a plank resting on a box and extending to the sidewalk; that the water had fallen an inch or two, as shown by the mark on the door above the sidewalk. Jaynes testified in behalf of defendant that he viewed the flood from the wagon road and railroad embankment on the Goldman side of the valley; that he stood there all afternoon watching the water and watching drift coming down; that the water kept rising and was still rising when he left, which was about 6 p. m.; but when he came back Monday morning it had fallen a little, about 4 inches, and was only about a foot higher above than below the trestle, while on Sunday the difference was about 2 feet. Lipske, witness for defendant, testified that the water was rising at about 6 p. m. Sunday when he left the dump; that next morning there was not much difference, it looked the same to him, but it was falling slowly. John Dawarak testified that the water kept rising until some time Monday; that he was on the Casten place, about one-half mile from the Huff Power place at the time; that the water was not confined to bayous, but spread out over the whole ground, and was spread out when it struck Vogt's land. Wright testified that all day Monday the water was up pretty near the top of the dump; that it began falling on Monday, but fell slowly. Jones testified that on October 5th, the water was within a couple of feet of the trestles in the valley, and that he sent telegrams to the effect that at 6 p. m. the river was still rising at the bridge and the water was one foot from the Goldman Hill. Malitz testified that the river rose at the railroad bridge until Monday morning, and remained practically at a standstill for about a day; that in December it was about two inches higher at the bridge.

Vogt's premises comprised the following tracts of land: (1) The Cash Jones 30-acre tract, which was about 250 yards northwest of the Poindexter trestle; (2) the Ellen Randall 40-acre tract, which is northwest of the Cash Jones tract, but with the Urban 40-acre tract intervening between; (3) the Ellen Randall 10-acre tract, which adjoins the Randall 40-acre tract on the northwest; (4) the Ellen Randall 20-acre tract, which adjoins the Randall 40-acre tract on the southwest; (5) the Charles Webber 40-acre tract which corners in the Goliad road and is bounded by the J. Urban 40 acres on the northeast. He had in cultivation all of this except 5 acres of the Webber land. In the Webber field he had about 30 acres planted in corn, and the rest in cotton. The Cash Jones field was all planted in cotton, and in the Randall fields 60 acres in cotton. The evidence fails to show the location of the crops on the Webber and Randall lands, there being about 13 acres of land unaccounted for. Vogt testified his corn had a yield of 50 or 60 bushels per acre, worth 80 cents to $1 per bushel, and that the expense of harvesting and marketing same would be .10 to 15 cents per bushel; that he had about 18 or 20 bales of cotton on the stalks, worth $60 per bale, and the expense of gathering and marketing would be about $12 to $15 per bale; that the cotton seed would amount to 9 tons, worth $20 per ton; that he lost 9,000 pounds of cotton seed he had housed for planting purposes worth $25 per ton; and that he lost about 3 tons of sorghum cane worth $15 per ton. The evidence does not show where the seed was housed. The cane was stacked in the field, but the evidence does not show in which field.

The evidence on the issue, whether the destruction of the crops was proximately caused by the fills, consists largely of conclusions. Several witnesses testified to the fact that

the water was backed up above the railroad embankment on Sunday afternoon. Vogt testified that he would only have lost the corn lying on the ground, not exceeding 100 bushels, and only two or three bales of cotton, that hanging within 4 to 6 inches of the ground, had it not been for the fills under the trestles. He said:

"When the water reached the trestle it rose on the upper side and backed up over the farms; there was not outlet enough to let it through. The water was on the same side as my field and residence. When the water reached the trestle it raised and spread back over the fields from the dump; I mean the fields that I cultivated and the rest of them that cultivated the neighboring fields there. Previous to the making of these fills the water would pass on through. The water in 1900, 1903, and in May, 1914, did not do any damage to my fields to amount to anything, but went on through the trestles. The October overflow took the biggest portion of these fills out, and the December overflow took the rest. They were not there in the May overflow of this year, neither were they there in the overflow of 1900 and 1903. When the waters in the October flood reached these fills under the trestles and rose and spread back over my fields, after the embankment gave way it got such a current that it knocked my crops down and swept them along. Before the water went down in my field it rose up so high that it got nearly everything under the water, and when the embankment gave way the current then took it along. I lost everything in there; it destroyed my entire crop."

Joe Urban testified he did not believe Vogt would have lost 200 bushels of corn had the fills not been there, and might have lost a bale or two of cotton. He testified further that the floods of 1900, of December, 1913, and May, 1914, passed right on and did not harm anything, but in October, when the fills were there, they were drowned out; that the water "filled up about 4, and pretty near 5, feet higher than it used to"; that on Monday it entirely covered Vogt's land, and that it was deep on Vogt's land Sunday and Monday and remained longer than three days. Ernst testified that on Monday morning the water was still over Vogt's land in places—he did not think it was over the whole place. Goldman testified that the water remained for two, three, or four days north of the trestles; that Vogt's land was about midway in that line, so the water stayed all over this country and remained naturally over the Vogt land, and it was several days before it ran off. Seiler testified:

"I observed some difference in the conduct of the water at those trestles as between the 1900 overflow, the 1903 overflow, and the overflow of October, 1913, and the difference was that the water on the north side of the track was a heap higher in October, 1913, than it was in previous overflows. I know what caused it to be higher; the trestle filled up a great deal and the water could not get through; the openings had been closed with these fills."

Seiler, recalled, testified that if there had been no dump the water would have gone through in low places; that he was "willing to swear to a certain extent" that if it had not been for the railroad embankment the water would have gone only in the low places through the fields. In some places where it was probably 4 or 5 feet deep it might have gotten a couple of inches or 6 inches deep. If the dump had not been there the water would only have gotten over the fields 1 or 2 inches deep in places, where it was 4 or 5 feet deep. That the overflow of October, 1913, would not have covered that river valley above the Goldman place north and west of the railroad if it had not been for the fill. Pickering testified the water from the Power levee ruined his crops on the land over which it passed; that it laid the corn down on the Depine, Smith, Possi, and Flummer lands, all situated in the vicinity of the Huff Power place, and destroyed all fences. Dawarak, whose place was about a mile above the Goldman trestle, testified the flood swept over 20 acres of his land, taking all crops along, and that it covered his ground about 6 feet deep.

The elevations on the Cash Jones land range from 51 feet to 57.3 feet above the sea level. In the west corner there is a small portion of which the elevation is 51, then going east it gradually rises, the tract being divided practically in half by the contour line marked 54. It continues to rise as you go east, there being two small portions of which the elevation is greater than 57 feet. One of these faces the gravel road just back of Fiek's store, while the other is along the northeast line of said Cash Jones' tract, near the east corner thereof.

The elevation of the Webber tract is from 52 to 54.9, about two-thirds thereof lower than 54.

The Ellen Randall 20-acre tract has elevations ranging from 52 to 54.9, the highest point being adjoining the highest point of the Webber land; that is the north corner of the Webber land. The house on the Webber land is in the south corner.

The Ellen Randall 40-acre tract has elevations ranging from 52 to 58 and 59, only a very small part being as low as 52, but fully two-thirds is below 56. About one-sixth of it is between 58 and 59.2 feet elevation, only a very small part being above 59. It slopes upward from the west corner towards the northeast line.

The elevations upon the Ellen Randall 10-acre tract range from 53 to 56.7.

Vogt's residence was upon the Cash Jones land at an elevation of 55.5 feet. There is no testimony with regard to high-water marks at this place on Sunday and Monday. On the Webber tract, and near the south corner thereof at the elevation of 52.5 feet, there is a house at which the high-water mark of the October, 1913, flood is at an elevation of 57.47 feet, showing that the water rose 4.97 feet at that place. During the December, 1913, flood it rose 2.26 feet higher at this place than during the October flood.

There is a house upon the Ellen Randall 40-acre tract, situated near the east corner,

at an elevation of 57.1 feet. At this place the high-water mark during the October flood shows 2.4 feet rise. In December it rose 1.3 feet higher. The distance to the Poindexter trestle is about 3,000 feet. The difference in elevation between the bottom of both trestles and this place is 8.1 feet.

On the Charles Jones land, situated about 10,600 feet north of the trestles, the water rose 1.3 feet in October, and in December rose .4 of a foot higher. The difference in elevation between this place and the trestles is 16.8 feet.

At the Huff Power place 8,0000 feet in a northwesterly direction from the trestles the water was 4 feet high during the October flood, and in December was 1.1 feet higher. The difference in elevation between that place and the trestles is 10.6 feet.

The elevation at the front of Fiek's store is 57 feet. Ernst testified that at Fiek's store the water lacked two inches of coming "into the floor" during the October flood, and during the December overflow it was 16 inches deep in the house. The elevation at Seiler's house, as shown by the map, is between 57 and 57.3 feet. The elevation under each of the 2 trestles is 49 feet, and the ground between them rises 2 feet next to the trestles. The elevation at the bank of the river, at the wagon bridge, is 60 feet; that at the base of the foothills on the north side of the track is 61 feet. A contour map was introduced in evidence, but it, as well as the other maps, is too large to be copied and made part of this opinion, so we content ourselves with stating the most important facts regarding elevations and height of water testified to by La Nue and shown by his map.

[1] Appellant challenges the sufficiency of the evidence to sustain the verdict and judgment. The first contention is that the flood was of such magnitude and extent as to constitute an act of God within the legal meaning of such term. We find no merit in this contention. Railway v. Pomeroy, 67 Tex. 498, 3 S. W. 722; Railway v. Madden, 46 Tex. Civ. App. 597, 103 S. W. 1195; I. & G. N. Ry. v. Penney, 178 S. W. 971.

[2, 3] The second contention under the first assignment of error, which is announced in propositions 2 and 3 and the subsidiary propositions thereunder, may be briefly stated to be that the evidence fails to show any causal connection between the partial filling in of the trestles and the destruction of plaintiff's crops. This contention is made in two ways: First, that the evidence conclusively establishes that the damage would have been wrought whether any portion of the trestles had been filled in or not. Second, that if it does not conclusively establish that fact, it does establish such a state of facts as to make it evident that it is at most the purest surmise, speculation, and conjecture whether the partial fills contributed in any wise to cause the damages to ap-

pellee's property. The fifth proposition may profitably be considered with the second and third, for by it the contention is made that the court should have instructed a verdict for appellant—

"because the damages sought are for the total destruction of fully matured crops and farm produce, and the uncontradicted evidence shows that same would in any event have been flooded and damaged whether the fills had been under the trestle or not, and in any event it is therefore pure surmise, speculation, and conjecture as to what particular part or amount of the damages, if any, was caused said matured crops and produce by the presence of the partial fills during a few hours at the inception of the flood; and therefore any verdict in favor of appellee would necessarily be based on pure speculation, conjecture, and surmise."

The testimony most favorable to appellee shows that the water was backed up on Sunday afternoon until it was 5 or 6 feet higher on the upper side of the dump than on the lower. This does not mean that the water on the upper side was 5 or 6 feet higher than its natural level would have been, for necessarily, by withholding the water from below, the natural level of the water below the dump was decreased. It is therefore a matter of conjecture to what extent the level of the water was raised by reason of the fills, and this uncertainty is heightened by the fact that in great overflows the dump, one-quarter to one-half mile long, between the trestles, concerning which no complaint is made, would obstruct the flow of the water and so would the trestles themselves to a slight extent. During the December flood, when the fills were gone, the high-water mark at the Webber house was 2.26 feet higher than during the October flood; at the Randall house 1.3 feet; at the Huff Power place 1.1 feet; at the Chas. Jones place .4 of a foot. At the Fiek store the difference was about 18 inches. These differences are inconsistent with the theory that the greatest depth over plaintiff's land during the October flood was caused by backwater. The difference increases as the water approached the trestles, instead of decreasing when it came within the zone in which the backwater was supposed to mark the highest point. The Huff Power place was entirely above where any backwater could possibly have reached, yet the water was 4 feet high at such place as compared to 2.4 feet at the Randall house and 4.97 feet at the Webber house, and the difference between the December and October floods was less than at the Randall and Webber houses. These figures emphasize the importance of determining the exact time when the water was highest during the October flood, for if it was highest at 6 p. m. on Sunday, as several witnesses testified, or some time Sunday night, as Vogt appears to think, it might well be that it reached its highest mark at a time when the backwater no longer existed, but had passed through the trestles after they had been almost re-

stored to their former condition. That the high-water mark was reached at a time when the water was flowing instead of backed up is indicated by the fact that at the Randall place, which is 8.1 feet above the level at the trestle the water was 2.4 feet high, which would make it 10.5 feet at the trestle if it was backwater, while at the Webber place, which is 3.5 feet higher than at the trestle, it was 4.97 feet high, making only 8.47 feet at the trestle if it was backwater. But if it be conceded that the water reached its highest level at a time when it was restrained by the partial fills, and we think there is testimony to that effect, though it is inconsistent with the evidence just discussed, still we cannot escape the conviction that the evidence leaves it a matter of surmise and speculation as to what amount of damage to plaintiff's crops can be attributed to the backwater. It is easy enough to say that if the fills cause the water to back up to a depth of 5 or 6 feet more than its natural level, it caused it to cover all of plaintiff's fields. But, as has been stated, we know that evidence of its being 5 or 6 feet higher on the upper side than the lower does not show that the fills backed the water so it was 5 or 6 feet deeper than it would have been had they not existed. But aside from this the evidence shows that plaintiff's fields to a large extent lay right in the depression through which the water must come. It shows that such an enormous quantity came down through the depression leading from the Marshall levee that it was backing away from the trestles when it was joined by the water from the Power levee. It shows that from Sunday at noon until Monday morning water was pouring through that valley to such an extent that two openings, each of which was 150 feet wide to start with, and each of which increased rapidly in width, were filled to a depth of about 8 or 10 feet; and the whole valley was a sea of water from the foot hills on one side of the river to those on the other side. Between 4 and 5 o'clock the Poindexter fill at the east end had disappeared to the extent of two-thirds, and it had gone out in chunks at the west end. The evidence is convincing that most of the fill which disappeared during the flood was gone by 6 o'clock on Sunday, and on Monday morning practically all that washed out had gone. It is inconceivable that all of this water should pass along the puny sloughs and cover plaintiff's crops only to the extent of 4 or 6 inches. The slough from the Marshall place was 40 feet wide and 7 feet deep. The one from the Power place was broader and shallower. The testimony is exceedingly meager on the issues relating to the exact depth of the water above the trestles during Sunday night and Monday morning. Jaynes and Lipske, both witnesses for defendant, both of whom looked at the water at the trestles late Sunday and again on Monday morning, testified that there was very little difference. Jaynes said it was about 4 inches lower, while Lipske testified it looked the same to him, but was falling slowly. Ernst, a witness for plaintiff, testified it had fallen a couple of inches or a foot; that at Fiek's store it had not fallen much, but at his, Ernst's, house it had fallen a foot. His house is close to Vogt's house and on the same side of the gravel road. Seiler, another witness for plaintiff, testified the water had fallen about 2 feet at his place Monday morning. His place is across the gravel road from Ernst's place, Fiek's place, and the valley in which the two trestles are situated, and the water which would reach his place would have to pass over the gravel road or come from the Wilden place, a little above the railroad bridge. It appears that defendant's employés opened up the cattle guards in the dump close to this place, and the water between the road and the track could flow through same. It is strange that it was not considered important to fix the time when these witnesses viewed the flood on Monday morning. Because there may have been a difference in time when it was viewed by the witnesses, and on account of the facts above stated, there is not necessarily as great a conflict in the testimony as it first appears. Joe Urban, who has a suit against defendant, based upon the same theory as this one, testified the water began falling on Monday, and that it was deep all over Vogt's land on Monday. Vogt testified it rose up to Monday morning. But taking the testimony most favorable to plaintiff, we find that the water was slightly lower on Monday morning than on Sunday afternoon, this difference being most probably from 4 inches to a foot, as the conditions at Seiler's are such as to make the water at his place hardly a fair test of conditions across the road in the valley where the great flood was passing through. Vogt's land had elevations ranging from 51 to 58 feet, and yet on Monday his whole place was under water, and some of his witnesses say it was under water on Tuesday. It is evident so much water came down the valley that a very large part of his crops, if not all, would have been washed out regardless of the existence of the fills. What is a conclusion to the effect that the fills caused the loss worth in the face of the testimony in this record? What is a conclusion to the effect that the water would have only damaged cotton from 4 to 6 inches from the ground worth when measured by the evidence relating to the elevations upon his fields and of the enormous amount of water which swept down through them on Sunday afternoon, Sunday night, and all day Monday? If it be conceded that the fills caused the water to be 2 feet higher on Sunday than on Monday, the fact remains that all of the Web-

ber land is lower than 55 feet above the level of the sea; two-thirds of the Cash Jones tract; nearly all of the Randall 20-acre tract; about half of the Randall 40-acre tract; also, about two-thirds of the Randall 10-acre tract. If the water was all over Vogt's land on Monday, which is not denied, it was from 2 to 6 feet deep upon about two-thirds of the land.

We conclude that the second contention stated by us as being made under propositions 2 and 3 should be sustained, and that the contention asserted in the fifth proposition must also be sustained. The fourth, sixth, and seventh propositions are without merit. The first assignment is sustained for the reasons above stated.

The second and twenty-ninth assignments relate to the same matter as the first, and need not be considered.

[4, 5] By the third assignment complaint is made of the admission of certain testimony of Herman Goldman as follows:

"The water on the Vogt farm was backwater, and not flowing water. The water had backed up from the railroad track on account of that embankment under the trestle."

This testimony was objected to as a conclusion of the witness, and one at that which related to the sole issue to be determined, and also because it was not alleged that the railroad embankment caused the water to back up, the allegations being directed only at the fills. We think it was permissible for the witness to testify that the water was backed up, which follows necessarily from obstructions thereof. G., C. & S. F. Ry. v. Locker, 78 Tex. 279, 14 S. W. 611. The statement that such backing up was on account of the portions of the 3-mile embankment made by fills under the trestles was a conclusion of the witness upon a matter upon which the jury was in as good a position to pass as the witness. The water would necessarily, if obstructed, back up first at the lowest part of the embankment, namely, the fills under the trestles; but whether those fills alone were responsible for the backed up condition of the water standing 8 or 9 feet high against them and from 6 to 8 feet against an embankment between them, the length of which was a quarter to a half mile, as well as other portions of embankment, was one of the vital questions to be determined, and we do not think it was permissible to establish it by conclusion. However, as part of the answer was admissible and it was objected to as an entirety, the court did not err in overruling the objection, and the assignment must be overruled.

[6] There is no merit in the fourth, fifth, and sixth assignments of error. The witnesses merely testified that the water was higher on the upper side because of the fills under the trestles. If it was backed up it is evident from the other testimony that the fills contributed to cause the condition, and

the jury would necessarily so conclude. The testimony is not subject to the construction that the witnesses were undertaking to attribute the depth of the water solely to the fills.

The seventh assignment is well taken. The witness should not have been permitted to state the conclusion that the fills caused the water to fill the whole valley up.

[7] There is no merit in the eighth assignment. While the question assumed a fact, that fact had been testified to by the witness, and the error, if any was committed, was harmless.

[8] The ninth and eleventh assignments are sustained. It was not permissible for Vogt and Urban to testify that Vogt would only have lost certain portions of his crops had the fills not existed. These conclusions went to the most vital issue in the case, namely, whether the fills were the proximate cause of the destruction of any part of plaintiff's crops, and, if so, what part. T. & P. Ry. v. Slator, 102 S. W. 156; Taylor v. Butler, 168 S. W. 1005; Gate City v. McGuire, 112 S. W. 439.

Assignments 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 28 are overruled.

We have held that the peremptory instruction should have been given for the reason that the testimony was of such a character that it left it altogether a matter of surmise and speculation as to what extent the damage to plaintiff's crops was caused by the fills, if they were the proximate cause of any part of such damage. If this could not be said of the testimony as a matter of law, it would have been proper to submit the issue which defendant sought to have submitted in the special charge mentioned in the twenty-sixth assignment of error, namely, that if the jury was unable to determine from the evidence with reasonable certainty what portion of the damage was proximately caused by the existence of the fills, they would have to find for the defendant.

[9] The twenty-seventh assignment complains of the refusal of a special charge, which would have required the jury to find for defendant if it was unable to determine what portion of the damages was caused by the fills and what portion by other obstructions if they found there were other obstructions. The evidence shows that there was a gravel road at the south corner of the Webber land, between it and the railroad track, which road also runs along the south line of the Cash Jones tract; it also shows that a gravel road ran along the southwest side of the Webber tract. No testimony is pointed out in the statement, nor have we found any, from which the jury could find that the roads in the vicinity of Vogt's land alone would have caused any water to back upon his land, the drainage conditions and size of bridges not being shown. There is some testimony of the road obstructing water

in front of the Goldman trestle. The assignment is overruled.

The judgment is reversed, and the cause remanded.