## CITY OF AUSTIN v. HOWARD.

No. 8993.

Court of Civil Appeals of Texas. Austin.

Nov. 19, 1941.

Rehearing Denied Jan. 28, 1942.

Amended Motion for Rehearing Denied Jan. 28, 1942.

558

Trueman O'Quinn, City Atty., Horace W. Morelock, Gibson R. Randle, and W. T. Williams, Jr., Asst. City Attys., Hart & Brown, Powell, Wirtz, Rauhut & Gideon, and C. B. Jeffrey, all of Austin, for appellant.

Looney & Clark, and Cofer & Cofer, all of Austin, for appellee.

BAUGH, Justice.

Appeal is from a judgment, based upon a special issue verdict, in favor of Howard against the City of Austin, for $15,000 damages to his land and nursery stock caused by the 1938 overflow of the Colorado River. Howard's 40 acres of land, on which he operated a nursery, is located in the Colorado River valley some three or four miles east of, or down the river from, the City of Austin, and subject to overflows from the river. In 1936, the City of Austin established a sewage disposal plant south of and between Howard's tract and the main channel of the river. At this point the course of the river is substantially from

west to east, but to the east of this area the course turns northeastward.

The site of the sewage disposal plant was in close proximity to Howard's south line. The plant covered several acres, was also located on lands subject to overflow, and when completed, the City, in order to protect it against flood waters, erected a levee completely around it, some 10 to 12 feet in height above the level of the surrounding ground. The upstream or west end of this dyke came approximately to a point, and widened out eastward. On the north side of the plant it ran approximately parallel to Howard's south line and on the south side it ran approximately parallel to the main channel of the river. The enclosure thus made around the disposal plant was about 1,200 feet long, pointed at the west or upper end, and widening out near the center to approximately 500 feet.

Howard's suit was based upon the grounds alleged that the City had negligently constructed, in one of the flood channels, where the water was accustomed to flow when the river overflowed, an obstruction which diverted the flood waters of the river from their natural channel and caused same to flow across his lands at a greater depth and at a greater velocity than otherwise would have occurred, thus causing the damage complained of.

In addition to general and special exceptions and general denial, the City urged as defenses:

1. That plaintiff's lands, due to the unusual flood, would have been overflowed and would have sustained the same damage even if the levee had not been built.

2. That plaintiff's damages were due to an act of God in that the flood in question was unprecedented.

3. That the City in the erection of the plant and levee was acting in a governmental capacity to protect the public health and was therefore not liable.

4. That plaintiff with full knowledge of all the facts, and of previous overflows, was guilty of contributory negligence in planting a nursery on lands subject to such overflows and should have anticipated such damages.

The case was tried to a jury on special issues in answer to which they found:

1. That the City built its plant and levee in a portion of the flood channel of the Colorado River.

2. That the levee around it obstructed a portion of the flood channel, and diverted a part of the flood waters of the flood of July, 1938.

3. That such diversion of these waters damaged Howard's land to the extent of $4,000; and his nursery stock to the extent of $11,000.

4. That the 1938 flood was not an unprecedented flood.

5. That the City was guilty of negligence in building the levee where and as it did; and that such negligence proximately caused plaintiff's damages.

6. Special issue No. 16 submitted to the jury was: "Do you find from a preponderance of the evidence that if defendant's sewage disposal plant and the dyke or levee surrounding the same had not been constructed, the flood occurring in the Colorado River, in July, 1938, would, nevertheless, have caused approximately the same damage, if any, which it did cause to Plaintiff's land and shrubbery?"

To this issue the jury answered "No."

Appellant's first contention embodied in propositions 1 and 4 is that the evidence shows as a matter of law that the 1938 flood was unprecedented, and consequently an act of God, and that the City was not, therefore, liable for the resulting damages.

 This issue was submitted to the jury under proper instructions, not here complained of, as to what constituted an unprecedented flood, and found against the City. The evidence did show that the 1938 flood because of its duration did discharge a greater quantity of water than any flood of which the United States Department of Agriculture (dating back to 1898) had any record; but it was also shown that all of this area, including Howard's land and that constituting the situs of the disposal plant, had been overflowed in 1899, 1900, 1913, 1922, 1929, 1935, and 1936. That the 1929, 1936, and 1938 floods were of approximately the same height; but that the 1935 flood, though of shorter duration, was some six or seven feet higher than the 1938 flood. Thus the jury was warranted in finding that the 1938 flood could, in the light of past experiences, have been reasonably anticipated. This is the test in determining what constitutes an unprecedented flood. Gulf, C. & S. F. R. Co. v. Pomeroy, 67 Tex. 498, 3 S.W. 722; San Antonio & A. P. R. Co. v. Kiersey, 98 Tex. 590, 86 S.W. 744; Mistrot–Calahan

Co. v. Missouri, K. & T. R. Co., Tex.Civ. App., 209 S.W. 775; 1 Tex.Jur., §§ 3 and 4, pp. 694–699, and cases cited.

■ Appellant also contends that it was entitled to an instructed verdict because the evidence conclusively showed that Howard's land and shrubbery would have suffered the same damage from the 1938 flood had the sewage disposal plant not been built. Suffice it to say that this issue was found against appellant on conflicting evidence. Consequently this contention cannot be sustained.

■ The next contention presented relates to the refusal of the trial court to submit to the jury special issues requested by the City. We shall not prolong this opinion by a detailed discussion of the several issues requested. Some of them were in effect covered by the issues submitted to the jury, while others as requested were either too indefinite or were duplicitous in that they embodied in one question damages both to the land and damages to the shrubbery growing thereon, separate items of damage.

We have reached the conclusion, however, that the court erred in failing to submit, as requested special issue No. 9, which in reality embodied four related issues. These issues were:

"No. 9. A. Do you find from a preponderance of the evidence that the construction of the new Montopolis Bridge and the new road and approach leading to said Bridge on the north side of the Colorado River created an obstruction or restriction to the flow of the flood waters in said River during the flood occurring therein in July, 1938?

"B. Do you find from the evidence that the construction and existence of the new Montopolis Bridge and the road and approach leading to such Bridge on the north side of the Colorado River obstructed or diverted flood waters in said river during the flood occurring therein during July, 1938, so as to divert the same and cause them to flow over and upon plaintiff's land in a different manner than they would have flowed except for the existence of such bridge, road and approach?

"If you have answered the foregoing question in the affirmative, and only in that event, you will answer the following:

"C. Do you find that the construction and existence of the new Montopolis Bridge and the road and approach leading to such Bridge on the north side of the Colorado River, as the same existed during the flood occurring in said river during July, 1938, contributed to the injury or damage, if any, suffered by plaintiff's land and shrubbery during such flood?

"D. If you have answered the next preceding issue in the affirmative, and only in that event, then you will answer the following:

"Are you able to determine from the evidence before you what proportion of the injury or damage, if any, suffered by plaintiff's land and shrubbery was caused by waters of the Colorado River diverted across said land, if any was so diverted, by reason of the construction and existence of defendant's sewage disposal plant and the levee or dike surrounding the same, or what proportion thereof was caused by the construction and maintenance of such Bridge, road and approach, as the same existed at the time of said flood?"

■ While such defense was not specially pleaded by the City it was raised by the evidence, and the City was entitled, under its general denial, to have these issues determined by the jury. Gulf, C. & S. F. Ry. Co. v. Seydler, Tex.Civ.App., 132 S. W.2d 453; Wichita Valley R. Co. v. Marshall, Tex.Civ.App., 37 S.W.2d 756, 758; San Antonio & A. P. R. Co. v. Gurley, 37 Tex.Civ.App. 283, 83 S.W. 842; 41 Tex.Jur. § 282, p. 1120.

■ It is settled that one who obstructs the flood channels of a stream so as to cause the flood waters thereof, when the stream overflows, to flow upon and injure the lands of another, if without the obstruction, such injury would not have occurred, is liable in damages. Bass v. Taylor, 126 Tex. 522, 90 S.W.2d 811; State v. Hale, Tex.Civ.App., 96 S.W.2d 135; Id., 136 Tex. 29, 146 S.W.2d 731. Nor is such liability based upon negligence, but upon Sec. 17, Art. I of the Constitution, Vernon's Ann.St. City of Brady v. Cox, Tex.Civ.App., 48 S.W.2d 511; Hale case, supra; City of Waco v. Rook, Tex.Civ. App., 55 S.W.2d 649, 653, and cases therein cited.

We shall not undertake to review here the evidence on these issues. The statement of facts, in addition to numerous exhibits, contains more than 2,000 pages. Briefly summarized the following facts are substantially without dispute: All of the

lands of Howard and of the City were overflowed by such floods as occurred in 1935, 1936, and 1938. There was a flood channel running from west to east across the south or southeast corner of Howard's 40 acres and extending over onto the lands where the City erected its sewage disposal plant, into a part of which this plant extended. Another flood channel of a few feet higher elevation began at Howard's southwest corner and extended northeastward across part of his land. When the flood waters of the Colorado River first left its regular channel and began to cover Howard's land they came in from the east or downstream side, as backwater without current. But as the river rose to the height of the 1935, 1936, and 1938 floods, the waters from the river left its regular banks to the west, or upstream from this area, and flowed slowly, as compared with the main current, eastward through these flood channels. Some distance to the west, or upstream, from the lands here involved is located the Montopolis Bridge across the river. The elevation of the highway approach to the north end of this bridge was such that in extreme floods, such as those of 1935 and 1938, the flood waters leaving the channel above, or west, of this bridge spread over and across this highway approach and eastward down the river valley through the flood channels over the lands here involved. This bridge was washed away by the 1935 flood, and a new bridge built, prior to the 1938 flood, several feet higher than the old bridge. The approach to it on the north was also raised several feet so that the flood waters which in 1935 had flowed across the approach, were all converged into the main channel of the stream and all forced to pass under the bridge. In other words, one of the flood channels upstream was obstructed by the highway dump and excess waters which had theretofore flowed across it diverted back into the main channel under the new bridge. There was evidence tending to show, and from which the jury could have concluded, that this caused the waters above the bridge to rise higher than they otherwise would have risen, accelerated the speed of the current below the bridge faster than it otherwise would have been, caused the waters after passing beneath the bridge to "fan out" as stated by some of the witnesses, and thus enter the lower flood channels and pass over Howard's land and the land of the City from a different direction and at a greater rate of speed than they would have flowed but for the construction of the new bridge by the State, and the raising of the dump approaching it from the north. One competent engineer testified that in his opinion very little damage was caused to Howard's lands and shrubbery by either the City's levee or the elevated highway dump; but that such as was caused, was attributable about equally to the new highway construction and to the City's levee around its plant.

■■ While there may be some confusion in the decisions, it seems now well settled that where two wrongdoers, acting wholly independent of each other, cause injuries to another, each is liable only for the damages caused by its own wrong. Wilson v. Hagins, 116 Tex. 538, 545, 295 S. W. 922; Sun Oil Company v. Robicheaux, Tex.Com.App., 23 S.W.2d 713, 715; Wichita Valley R. Co. v. Marshall, Tex.Civ.App., 37 S.W.2d 756; Powell Salt Water Co. v. Bigham, Tex.Civ.App., 69 S.W.2d 788, 789; Windfohr v. Johnson's Estate, Tex.Civ. App., 57 S.W.2d 215; Baylor University v. Bradshaw, Tex.Civ.App., 52 S.W.2d 1094, 1100; City of Pampa v. Long, Tex.Civ. App., 110 S.W.2d 1001, 1003; Gulf, C. & S. F. Ry. Co. v. Seydler, Tex.Civ.App., 132 S. W.2d 453, 455. The evidence, taken as a whole, and the physical facts and circumstances shown, were, we think, clearly sufficient from which the jury could have found that a part of the injuries sustained by Howard were due to other causes than the erection by the City of its levee around its plant; and particularly from the elevation by the Highway Department of the north approach to Montopolis Bridge. The City was therefore entitled to have this issue submitted as an affirmative defense raised by the evidence. And this is true regardless of the findings of the jury on the issues submitted to them.

While there are cases holding that where the evidence clearly shows that such injuries are caused in part by other wrongdoers than those sued, and that it is impossible to ascertain the proportionate damages caused by each, plaintiff is not entitled to recover anything, such case is not here presented. See Tucker Oil Co. v. Matthews, Tex.Civ.App., 119 S.W.2d 606; Galveston, H. & S. A. R. Co. v. Vogt, Tex. Civ.App., 181 S.W. 841, 848; Houston & T. C. R. Co. v. Hanson, Tex.Civ.App., 227 S.W. 375, 377.

562

The next question presented relates to the measure of damages to the land. In special issues 5 and 6 submitted to the jury they were asked to find the reasonable cash market value of said lands "for agricultural and nursery purposes" immediately before and immediately after the 1938 flood. Appellant contends that no such restrictions of use of such lands should have been made; but that its market value for any purpose should have been submitted. This contention should be sustained.

■ Appellee relied, as sustaining this restricted use, upon the language of Chief Justice Stayton, in Ft. Worth & N. O. R. Co. v. Wallace, 74 Tex. 581, 12 S. W. 227, 228, a suit for damages against the railway company for negligently burning grass in the plaintiff's pasture, and numerous grass burning cases following it. The damages there sought were not only for destruction of the grass, but for injury to the turf. The language there used must be construed in the light of the issues discussed and of the facts there involved. Chief Justice Stayton did, in that case, use the following language: "It is not the right of one, through whose wrongful act an injury has been done to the land of another, to have the measure of damages fixed by the effect the injurious act may have on the land if used for some purpose other than that to which it was applied or desired to be applied by its owner; but it is the right of the owner to have his damages measured by the extent of the injury to the land used for any lawful purpose to which he had appropriated it, desired to appropriate it, or to which it is adapted. [Fort Worth & D. C.] Railway Co. v. Hogsett, 67 Tex. [685], 687, 4 S.W. 365. It does not rest with the wrong-doer to say to the owner: Use your land for a purpose for which you do not desire to use it, and it will be as valuable to you for that use as it was before for another."

But that language was used in overruling the contention of the railway company that the destruction of the turf made it less difficult to put the land in cultivation. In other words, if the owner would convert his pasture into a farm, he was not injured. Manifestly that case is not in point here.

■ The plaintiff's allegations, segregating damages to the land from damages to the shrubs, were that "plaintiff's land was damaged in the aggregate sum of $10,-000, being the difference in the reasonable cash market value of said land before and after said damage thereto." (Italics ours.) This is the long established and well recognized measure of permanent damages to real estate. And in determining such value its market value for any purpose for which it could be sold in the open market must be considered. This measure of damages was as available to Howard as to the City. If he could have shown a value for other purposes greater than that for growing nursery stock, and a destruction by the City of that value, his damages would have been referable to the highest market value shown.

In Sherman Gas & Electric Co. v. Belden, 103 Tex. 59, 123 S.W. 119, 121, 27 L. R.A.,N.S., 237, the Supreme Court, speaking through Judge Brown held: "The trial judge instructed the jury to ascertain the value of the property for the purpose to which plaintiffs had dedicated it, just before, and such value, just after, the construction and operation of the plant. The charge was error upon a vital issue in the case. If plaintiffs' property will sell for as much for any use with the plant in operation as it would if the operation should cease, then no recovery can be had for the reduction of its value for use as a home. The purpose of the law, in giving damages, is to repair a loss; and, if the property will sell for as much as it would before the business was inaugurated, there is no loss in value to be repaired. This would not exclude proof of the fact, if it so be, that the lots were especially valuable for purposes of a home; but such evidence would not vary the rule of law that the difference in the market value for any use must be the measure of recovery."

Substantially the same rule was announced by Judge Williams in Boyer & Lucas v. St. Louis & S. F. & T. R. Co., 97 Tex. 107, 76 S.W. 441. See, also, Lone Star Gas Co. v. Hutton, Tex.Com.App., 58 S.W.2d 19; Brashear v. Martin-Wilder Co., Tex.Civ.App., 102 S.W.2d 302; 13 Tex.Jur., § 73, p. 160; 15 Am.Jur. Sec. 109, p. 518.

■ Under such rule any evidence, such as that offered by the City by cross examination of Howard, as to the existence, marketability and value of commercial building sand deposits on and beneath said lands, which had not been injured, and which would bear upon the market value of said land, would be admissible.

The next question presented is whether the court properly instructed the jury on the

issue of damages to the nursery stock, alleged by the plaintiff to have been a total loss. The jury was asked to find the reasonable cash market value of same growing in the field immediately before and immediately after the flood, with the instruction that such value "is arrived at by determining what the nursery stock would sell for in bulk or in convenient lots, and not the retail price." The City objected to this on the ground, among others, that as submitted "such issues wholly fail to permit the jury to make allowance for cultivating, caring for, marketing and preparing for market and delivery such nursery stock."

■ The measure of damages was properly submitted. That is, the reasonable market value in the field immediately before and immediately after the injury. It is the method of arriving at that value of which the City complains, urging that the rule applied to growing crops not yet matured would be applicable here. The rule relating to growing crops is that the value of unmatured crops at a given time is arrived at by determining what such crops would have made, and would have sold for, less the cost of cultivating, gathering and marketing same. As to such types of shrubs as had no market in July, 1938, but must be marketed in the winter, such a rule would clearly apply. But the testimony on this issue was that practically all of the nursery stock involved had a market in July; and related to the value at that time if sold in bulk or in convenient lots on the ground at the time, taking into consideration the expense of digging and balling the shrubs. In the light of this testimony, except as to such shrubs for which a market was not available until the winter months, the instructions given were proper. Since the fruit and pecan trees were not grown for the production of fruit and nuts; and all of the shrubs were grown solely for the purpose of sale, such nursery stock as was marketable at any time partook more of the nature of a stock of goods, than of an orchard or of a growing crop. See 13 Tex. Jur. § 39, p. 45; § 43, p. 53; § 65, p. 152.

■ Argument to the jury by one of the counsel for appellee is also complained of wherein counsel stated that he was judge in the first trial in that court house, the trial of Mary Dugan, wherein one of the City's principal witnesses was a witness in that case; that he had practiced on his testimony in that famous trial for days; and that "he reminded me of the prepara-

tion he had made for testifying in the Mary Dugan trial. He had it down pat." This argument was objected to and the jury instructed not to consider it "though the other trial may have been a theatrical performance." There was no evidence about the Mary Dugan trial or that it was a theatrical performance. Nor do we think it such an historical incident, nor so established in current literature or common knowledge that an average jury would be presumed to know that the story was fiction and the trial moot. By such reference, counsel undoubtedly meant to leave the inference that the witness had practiced his testimony and had "it down pat" in the instant case; clearly an improper manner of discrediting the witness. Whether the instruction of the court to the jury to disregard it removed whatever damaging effect it may have had, is, of course, difficult to determine. In view of another trial it need not recur, and further consideration of it here is unnecessary.

■ Another counsel for appellee in argument to the jury also stated that the City had paid $175 per acre (a matter not in evidence) for the land on which its sewage disposal plant was located. Upon discovery of such error, counsel subsequently himself requested the court to instruct the jury not to consider such statement, which the court did. This was, we think, sufficient to remove any adverse effect on value which the statement, made in good faith, may have had. This likewise need not occur upon another trial.

The City next urges that it was error to permit Bascom Giles, the Land Commissioner, to testify that one afternoon during the trial, after the day's proceedings ended, the City Manager and the Mayor called him by telephone and protested against his allowing one McMahon, reclamation engineer, an employee of Giles, to testify on behalf of Howard, and against the City. This on the ground that they regarded it as improper for a State employee to testify against the City; and as not showing a co-operative spirit between the City and the State. The information concerning this call appears to have been communicated by Giles to McMahon the next morning before the witness was called to conclude his testimony.

■ It may be conceded that this testimony was calculated to react adversely against the City. But clearly, we think, it was not error to admit it. It is well settled

that any attempt by a party to a suit to suppress testimony is improper, and may be shown by the adverse party. Johnson v. Whitehand, Tex.Civ.App., 21 S.W.2d 41; 17 Tex.Jur., § 231, p. 556; 20 Am.Jur., § 281, p. 266; 22 C.J., § 115, p. 176; Annotation, 38 A.L.R. 595 et seq. Inferentially such was the purpose of the telephone calls in question.

But appellant insists that these acts on the part of the officials named were clearly beyond their authority and not binding on the City, citing particularly the case of City of Austin v. Forbis, 99 Tex. 234, 89 S.W. 405, and other cases of like import. In that case, however, the statements involved related directly to the merits of the suit and to the liability of the city for the damages sought. A different situation is here presented; not one of facts involving liability, but of the suppression of testimony, the character of which is not involved, offered by plaintiff.

It is, we think, immaterial that the City Manager and the Mayor did not have the authority to settle or compromise Howard's claim without the consent and approval of the City Council; and that it was the function of the City Attorney to conduct the trial. These officials were representatives of the City with broad general powers, and the telephone calls occurred in the presence of a member of the City's legal staff. Manifestly they were actively interested and participating on behalf of the City in the conduct of the trial as they had a right to do, and their conduct should be deemed, under such circumstances, to be within the general scope of their authority.

The City also urges as error the admission of the testimony of the witness Platt, on the ground that he was not an expert, to the effect that the levee around the disposal plant caused the flood waters to flow across Howard's lands; and further that this was the ultimate issue to be determined by the jury.

■ We think there was no error in this. The general rules that the testimony of lay witnesses should be confined to facts of which they have personal knowledge, leaving inferences or conclusions therefrom to the court or jury, are well established. 19 Tex.Jur., § 3, p. 13, and § 14, p. 33. In the instant case the witness, who had observed several floods in this area, including that of 1938, and, as we understand it, had observed the flow of the waters as they struck the point of the levee, testified that, in his opinion, the levee caused the waters to flow across Howard's land. We doubt whether this even constituted an expression of opinion. Where a physical object in the flow of a stream and the action of the water as it reaches and passes it are clearly visible, the action of the object in diverting the flow of the water is a common observation and may be stated as a fact by a non-expert witness. It requires no expert skill to determine such fact. Nor did the question invade the province of the jury. The evidence conclusively showed that the flood waters did flow across Howard's land; and that when they reached the point of the levee they were divided, a part caused to flow on one side of the obstruction, and a part on the other. The real issues in controversy and the ultimate facts to be determined were whether the flood channel was obstructed and the waters so diverted by the obstruction caused to flow over appellee's land in a different quantity, manner, and velocity than they would have flowed, had the obstruction not been built.

■ The City also urges that the jury's finding that it was guilty of negligence in the location and manner in which the levee was built was wholly without evidence to support it. The liability of the City for damages, if any, to Howard's land was not dependent upon the City's negligence vel non. Hence this issue was, we think, immaterial. Such liability is based, as stated above, upon Sec. 17, Art. I, of the State Constitution. City of Brady v. Cox, supra; State v. Hale, supra; and City of Waco v. Rook, supra.

■ Nor was it error to refuse to submit to the jury the requested issue as to whether appellee's damage was due to an "Act of God." The same question was effectually submitted in the inquiry whether the flood was unprecedented. See 1 Tex. Jur. § 4, p. 698, and cases there cited.

■ It is immaterial that the City was acting in a governmental capacity, and erected said plant to preserve and protect the public health of its inhabitants. It is clear, we think, without prolonging this opinion to differentiate the case here presented, that the rule that a city is not liable for damages for property destroyed in the enforcement of quarantine regulations, or to prevent the spread of pestilence of infectious diseases, is not applicable to the instant case. No such questions are here involved.

While we have not undertaken to discuss all of the propositions presented by the City, what we have said disposes of the various questions presented. And in view of the conclusions reached, and the disposition made of the appeal, it becomes unnecessary to pass upon the appellee's cross assignments that the undisputed ·evidence showed, as a matter of law, that Howard was entitled to the full amount of the damages to the nursery stock sued for. This, based on the testimony of all of the nurserymen, several in number, that the market value of the shrubs destroyed was in excess of the amount claimed by Howard. It is manifest, however, that such cross assignments cannot be sustained; and that the jury did not believe all that these witnesses said. They could also have concluded from the evidence, as was their province, that the nursery stock was not totally destroyed.

For the reasons stated, the judgment of the trial court is reversed and the cause remanded for another trial.

Reversed and remanded.

### On Appellee's Amended Motion for Rehearing.

In his amended motion for rehearing, appellee insists, among other things, that it was not error for the trial court to refuse to submit the issues set forth in our opinion herein, for the reason that issue "C" inquired only whether the construction of the highway and bridge "contributed" to appellee's damages; whereas, the City could escape liability only by showing that the construction of the road and bridge independently caused the damage or a part thereof. Manifestly where the acts of two tort-feasors, acting wholly independent of each other, combine to cause a greater damage than would have resulted had only one of them acted, the acts of each must necessarily contribute in some degree to the total injury resulting from the separate acts of both. The test as laid down in both the Bradshaw and Robicheaux cases cited in the opinion·is whether the tortfeasors acted independently, and if so whether the portion of the whole damage attributable to, or contributed by, the independent acts of each can reasonably and separately be ascertained. If they can, then each is liable only for the injuries caused by his own acts.

It is also urged that if we adhere to our original opinion herein, under Rule 434, Rules of Civil Procedure, the cause should be reversed for trial only on the issue of damages. That is to determine whether the Montopolis bridge and the highway embankment caused a portion of appellee's damage; and the amount of the damage caused by the acts of the City.

Rule 434 is but a re-enactment of old Rule 62a; and consequently carries with it the interpretation and application of that rule by the courts. Without discussing the matter here it seems clear that in view of the errors pointed out in our opinion we would not be authorized to reverse only in part the judgment appealed from. The judgment is manifestly not severable in the respects urged. 3 Tex.Jur., § 810, p. 1150.

The amended motion is in all things overruled.

Overruled.