## BAYLOR UNIVERSITY et al. v. BRADSHAW.

No. 7653; Motion No. 7364.

Court of Civil Appeals of Texas. Austin.

June 27, 1932.

Rehearings Denied Sept. 28, 1932.

Jno. B. Atkinson, of Waco, for appellant International & G. N. R. Co.

Sewell, Taylor, Morris & Garwood, of Houston, for appellee and cross-appellant Bradshaw.

Jos. W. Hale, of Waco, for cross-appellee Union Automobile Ins. Co.

McCLENDON, C. J.

This litigation grew out of the following facts:

January 22, 1927, Wesley Bradshaw (herein called Bradshaw), while riding in a motorbus, was injured as the result of a collision between the bus and a train of the International & Great Northern Railroad Company (called herein the railroad) at a public crossing within the corporate limits of Round Rock, Williamson county. The bus was owned by Baylor University (herein called Baylor), and was used in transporting its athletic teams to and from intercollegiate athletic games in which its teams participated. On the occasion in question the Baylor basket ball team was being transported from Waco to Austin for a game that evening with the University of Texas team. Bradshaw, a former student of Baylor and former member of its team, was traveling in the bus as a guest at the invitation of the Baylor coach.

Bradshaw sued the railroad in McLennan county, alleging various acts of negligence. The railroad impleaded Baylor, seeking (in case judgment went against it) indemnity, or (in the alternative) contribution under R. S. art. 2212. Indemnity was sought on two grounds:

1. That the negligence of Baylor was the sole proximate cause of the collision.

2. That the negligence, if any, of the railroad was passive only, and that of Baylor active.

Contribution was predicated upon the theory that Baylor and the railroad were joint tort-feasors.

The trial court severed the railroad's cross-action against Baylor from the Bradshaw-Baylor suit, and upon a directed verdict, rendered judgment that the railroad take nothing by its cross-action against Baylor.

There was a mistrial in the Bradshaw-Railroad suit; and thereafter (November 23, 1927) the railroad paid Bradshaw $6,500, and the latter executed the following document (formal parts omitted):

"Whereas, on or about January 22nd, 1927, at or near Round Rock, Williamson County, Texas, Wesley Bradshaw was injured in a collision between a certain bus, then and there being owned and operated by Baylor University, a corporation, and a passenger train of International-Great Northern Railroad Com-

Jos. W. Hale, Nat. Harris, and H. M. Richey, all of Waco, and E. C. Gaines, of Austin, for appellant Baylor University.

pany, whereby the said Wesley Bradshaw claims damages against all persons legally liable to him, and as between said Railroad Company and said claimant an agreement has been made involving a covenant not to sue, and an assignment of the cause of action in part as against Baylor University; now, therefore, this instrument, witnesseth:

"1. For and in consideration of the sum of six thousand five hundred dollars ($6500.00) cash in hand this day paid by International-Great Northern Railroad Company to Wesley Bradshaw, the receipt of which sum is hereby acknowledged, said Wesley Bradshaw has covenanted and agreed, and by these presents does covenant and agree with said International-Great Northern Railroad Company that he will not, at any time in the future, present or prosecute any form of action whatsoever against the International-Great Northern Railroad Company, and will not sue or permit said company to be sued on account of the injury of the said Wesley Bradshaw, in so far as it lies within his power to prevent, and the said Wesley Bradshaw agrees to fully protect, hold harmless and indemnify the said International-Great Northern Railroad Company against any action brought for him by any other person whatsoever against the International-Great Northern Railroad Company, for and with the consent, assistance, or co-operation of the said Wesley Bradshaw, on account of the injury of the said Wesley Bradshaw.

"2. Further, in consideration of the payment of the said sum of $6,500.00, the said Wesley Bradshaw has this day assigned and conveyed, and by these presents does assign and convey unto the International-Great Northern Railroad Company, with the reservation hereinbefore specified, his entire cause of action, if any he has, against Baylor University, and all other persons, on account of the injury of the said Wesley Bradshaw in the collision above mentioned, hereby authorizing the International-Great Northern Railroad Company to employ an attorney in his name and behalf to prosecute any action or actions by International-Great Northern Railroad deemed necessary and advisable to protect its interests in this assignment, and to prosecute any action or actions in the name of the said Wesley Bradshaw, it being understood that the International-Great Northern Railroad Company is to assume and pay for all expenses incurred, including court costs and attorney's fees involved in the prosecuting of any such action or actions.

"The said Wesley Bradshaw reserves an interest, however, in said cause of action, and in the result of any suit or suits brought thereupon, to the extent of an amount not to exceed $100.00.

"Furthermore, the said Wesley Bradshaw obligates himself to co-operate with the International-Great Northern Railroad Company in the prosecution of any such action or actions against Baylor University, or any other person agreeing to appear and testify as a witness to the true facts known to them, and otherwise assist in any manner reasonably necessary; it being understood, however, that he is not to be out any money in the handling of such suit or suits, all expenses to be defrayed by the International-Great Northern Railroad Company.

"3. It is expressly understood that this instrument is not intended to accomplish a release of the cause of action arising on account of the injury of the said Wesley Bradshaw, but is intended only as a covenant not to sue, coupled with an assignment of the cause of action as against Baylor University, if any, with the reservation specifically noted."

Final judgment in the Bradshaw-Railroad suit was thereafter rendered, reading:

"On this, the 7th day of May, 1928, it appearing to the Court that all matters in controversy in the above numbered and entitled cause had been settled between the parties thereto, the Court is therefore of the opinion that this cause should be dismissed:

"It is, therefore, ordered, adjudged and decreed by the Court that this cause be and the same is hereby dismissed at defendant's cost, for which execution may issue."

This suit was brought in the district court of Williamson county in the name of Bradshaw against Baylor, for compensatory damages for the injuries he received as a result of the collision, several acts of negligence being alleged.

Baylor impleaded the railroad, setting up the Bradshaw-Railroad agreement as a settlement; alleged that the assignment feature of the agreement was void because Baylor and the railroad were joint tort-feasors, that Bradshaw had no substantial interest in the suit, and could recover in no event in excess of $100. Baylor also asserted, in case judgment went against it, that it was entitled to indemnity against the railroad, and in the alternative to contribution, upon the same grounds asserted by the railroad in the McLennan county suit.

The railroad, in defense of the cross-action of Baylor against it, set up the same acts of negligence alleged in the Bradshaw petition (1) as the sole and (2) as the active proximate cause of the collision, and, in the alternative, if Baylor be held to have the right of contribution against it, "that the amount to be paid by said defendant be apportioned as to what amount should be paid by each of them respectively."

The trial was to a jury upon special issues, resulting in the following findings:

1. That Baylor was guilty of negligence which was a proximate cause of the collision in each of the following particulars:

(a) The bus driver was driving the bus within the corporate limits of Round Rock at a speed in excess of 20 miles per hour as the bus approached the crossing where the collision occurred.

(b) The bus driver failed to turn the bus to the left so as to avoid the collision after discovering the approach of the train.

(c) The bus driver failed to bring the bus to a complete stop before driving upon the track.

(d) The bus driver attempted to beat the train over the crossing by accelerating the speed of the bus after discovering the approach of the train.

2. That the agents, servants, and employees of the railroad were guilty of negligence which was a proximate cause, but not the sole proximate cause, of the collision, in that they operated the "train at the time of the collision at a high and dangerous rate of speed."

3. That $6,500, "if paid presently, would compensate Wesley Bradshaw for the injuries received by him upon the occasion in question."

Other issues of negligence on the part of Baylor and the railroad were submitted, upon which there was either no finding, or a negative finding of actionable negligence. These issues will be noted later as they may become pertinent to the several questions presented.

Upon the above jury findings, the trial court rendered judgment in favor of Bradshaw against Baylor for $6,500, and in favor of Baylor upon its contribution plea against the railroad for $3,250. The case is brought to this court upon separate appeals by Baylor and the railroad. Bradshaw has not appealed or cross-assigned error.

The first point we will consider is the validity of the assignment to the railroad company upon the theory that it was not a tortfeasor, in that the evidence and jury findings conclusively showed that the negligence of Baylor was the sole proximate cause of the collision.

We shall later discuss the effect of the covenant not to sue and the assignment as constituting, vel non, a settlement and release of the railroad's liability. In our present discussion we will treat the instrument as being in effect a settlement and release.

The assignability of the cause of action generally is not questioned.

There is a conflict of authority upon the question whether the parties to a settlement for a single tort can thereafter assert that the party released was not in fact a tort-feasor. The question usually arises in a suit by the injured party against the other alleged tort-feasor. One line of authority holds that the injured party is estopped from asserting that the party settled with was not in fact a tort-feasor. The release in such case is held to operate as full satisfaction for the tort.

See authorities cited in 50 A. L. R. p. 1093; see, also, 1 Cooley on Torts (4th Ed.) pp. 263–268.

Regardless of the effect of the release upon the injured party, we incline to the view that, where coupled with an assignment, it should not operate as an estoppel against the assignee to assert that he was not in fact legally liable. The situation of the parties is not the same. The injured party receives compensation for an asserted liability against the assignee; whereas, the latter, without admitting his liability, is buying his peace from the assignor upon the consideration that he may assert the assignor's claim against a third party. There is no impediment to the assignee's acquiring the claim if he is not a tort-feasor, and we see no valid reason why he should be barred from litigating that question, merely because he regarded it of sufficient doubt to warrant making the settlement if coupled with the assignment. We will therefore treat the assignment as valid, if the evidence and/or jury findings establish conclusively that there was no liability on the part of the railroad.

At the outset it should be noted that if the evidence does not conclusively negative actionable negligence on the part of the railroad in the respect found by the jury (high and dangerous rate of speed of the train), but does show conclusively that the jury findings of actionable negligence on the part of Baylor necessarily negative actionable negligence on the railroad's part in the found respect, then there is an irreconcilable conflict in the findings as applied to the evidence, and they are mutually destructive of each other. The verdict in such event would not support a judgment for either party. See Hines v. Foreman (Tex. Com. App.) 243 S. W. 479; Brewster v. Forney (Tex. Com. App.) 223 S. W. 175; Lawson-Richards, Inc., v. Blalock Lbr. Co. (Tex. Civ. App.) 30 S.W.(2d) 797; and authorities cited in Speer on Special Issues, p. 563, chap. 434.

The findings, however, are not conflicting on their face, and since Bradshaw made no objection to the verdict in his motion for new trial or otherwise, but moved for and obtained judgment based upon the findings, we are probably precluded from going beyond the findings themselves to determine whether they present an irreconcilable conflict. But since this question and whether there is any evidence to support the finding of the railroad's negligence are so closely related, we will consider the evidence from both viewpoints.

The bus was traveling south on highway No. 2, a paved highway with very heavy traffic. It intersects the railroad track at right angles about 700 feet south of the main street of Round Rock, upon which the high-

way turns to the east. From this turn south to the crossing the highway is slightly downgrade. There are several buildings to the west of the highway that would cut off a view of the railroad to the west until a point about 200 feet from the crossing ·is reached. From that point to the crossing the only obstructions were a small toolhouse, a line of telephone poles, and a box car and passenger car, hereafter noted. A short distance west of the crossing, a branch line (Georgetown Branch) extends to the north or northwest, from which a side track extends to the west from a point a short distance west of the junction with the main line. In the western angle between the main line and Georgetown Branch and 331.3 feet from the crossing is a small toolhouse. The box car was upon the side track, a short distance north of the toolhouse, and a little farther north on the Georgetown Branch stood the coach. At a point about opposite the toolhouse the main line curves toward the southwest, and from this curve is straight for quite a distance. There is a 351-foot trestle on the main line, the east extremity of which is 616.3 feet west of the highway. From the photographs in evidence it appears that the toolhouse entirely cuts off the view of the track to the west of it to one on the highway between about 50 and 65 feet north of the crossing. The line of telegraph poles intersect the highway at about 85 feet from the crossing. The exact position of the freight car and coach is not conclusively shown. Very little of the track west of the toolhouse was visible from the highway north of about 230 feet from the crossing, even when the Georgetown Branch and side track were clear. This was due to the position of a residence about 200 feet north of the crossing. A train approaching the crossing from the west would appear to be coming almost directly toward an observer at any point on the highway within approximately 100 feet of the crossing. The depot was north of the track and a short distance east of the highway. It was a rainy day and there was a large pool of water or mudhole just east of the highway and north of the track. There were several eyewitnesses to the collision, from the testimony of whom a number of theories as to the proximate cause or causes of the accident might be constructed.

Wolf, the Baylor coach, testified that he was seated on the aisle, on the right-hand side of the bus about 5 feet from the driver. He was keeping a lookout for trains from the time the bus turned south. His first knowledge of the approach of the train was when he saw the engine appear in the opening between the toolhouse and the box car. He placed the distance from the bus to the crossing at this time at from 75 to 100 feet. Later in the day he returned to the scene and made a number of observations, and his estimates of distance are manifestly based upon such observations as well as his recollection of what happened at the time, as is evidenced from the following quotation from his testimony on cross-examination: "As to how I reached the conclusion that we were only 100 feet from the crossing when I saw the train, I was taking that from the position of the cars and the tool house, and my position in the road from which I could see between them. When I say that we were 100 feet from the crossing, it is just an approximation; we might have been a little farther; it is possible that we might have been as far as 125 feet."

His version of the occurrence is embodied in the following excerpts from his testimony: "* * * No one had made any exclamation or said anything about a train before I saw it. When I first saw the train I said, 'Look out; there is a train.' When I said, 'Look out!' Joe Potter (the driver) turned the bus to the left. As to the manner in which he turned the bus to the left, and then·this crash came, and what I know about it, I will state that when I first saw the train it showed up between the toolhouse and the end of the boxcar, and I told the driver to look out, there was a train. Going straight down that street to the railroad track the motor of the bus slowed, and he made a turn to the left, and then back across the track at a slight angle; in other words the road was going like this (indicating), and the bus in crossing the track was about like that (indicating) and the train hit the bus right about the rear right wheel. I never heard the train whistle, and never heard the bell ringing. * * * I should say that the bus had gone fifteen or twenty-five feet from the time I saw the train and called attention to it until the reception of my words by Joe Potter was indicated by the manner in which he handled the bus. I do not know whether Mr. Potter looked to his left or to his right after I said look out for the train, because I was looking at the train myself. The first indication that I had that he had received my warning was a slowing of the motor and then a turn to the left. It was not a right-angle turn to the left, but I should say about a twenty-five to thirty-five degree turn."

Gooch, another occupant of the bus, testified: "As to my knowledge of what happened from the time the bus turned around the concrete block up there, to its left, until the crash came,—I will state that we were going down toward the track—I remember making the curve, turning to the left there down the road, and I wasn't paying any attention to the driving—I couldn't see straight ahead, I was looking to the left of the bus, and we got on down the road, and I heard some one holler, 'Look out, there's

a train,' and I looked to the right, toward the side that the station is on, and looked at the track coming down this way (indicating), and there wasn't anything, and we got on down there and the bus turned just a little bit to the left and the front wheels were on the track, and I looked back over my shoulder and the engine was right on it, and I raised up and just as I raised up the engine hit us, and that is all I remember—it knocked me out. The first intimation I had on that day that a train was coming was when I heard some one say, 'Look out, there's a train.' As to my judgment of the distance we were from the track when that exclamation was given,—when I heard it, I looked, as I said, to my right to the station—that way (indicating), and when I looked straight ahead I could see the track in front, and then it was approximately fifteen or twenty yards to the track. Just as I looked to the front the bus turned a little to the left; it did not continue at the same angle to the left; but it straightened up and started on across the track; I thought it was going to make it all right, and I looked back over my right shoulder and the engine was right on us. I had not heard the engine whistle at any time before some one said, 'Look out, there's a train.' As to whether the engine was whistling after some one said to look out for the train and the engine was right on us, I heard a shrill whistle when the engine hit the bus—that was all."

Aten testified to a conversation he had with Potter a few minutes after the collision, in which Potter said: " 'Well, I didn't see it until I was right close and it was so close that I didn't have time, so I stepped on the gas to get across as quick as I could; I didn't have time to turn in there, it was too close to me.' And then he said he was excited,—he said he didn't know whether he stepped on the gas or on the brakes; afterwards he said he didn't know what he had done; he said he meant to step on the gas but did not know what he had done, he said; he said the train was so close to him."

The speed of the bus was estimated by the various witnesses at from 15 to 30 miles per hour; while that of the train was placed at from 50 to 70 miles per hour.

In addition to those given above, the jury made the following findings:

1. That the bus driver was guilty of negligence in not keeping a lookout for trains as he approached the crossing, but that this was not a proximate cause of the accident.

2. That the bus driver failed to clean the windshield, but that this was not negligence.

3. That the train operatives did not fail (a) to keep a proper lookout, (b) to blow the whistle, or (c) to ring the bell.

4. That the train operatives realized and appreciated the peril of the bus occupants, but not at a time when by the exercise of ordinary care in the use of all of the means at their command and consistent with their own safety and that of the passengers of the train, they could have avoided the collision.

5. That the collision was not the result of an unavoidable accident.

The effect of the jury findings was that each of four derelictions of the bus driver (a, b, c, and d, above), and the negligent speed of the train, entered into and formed an essential causal element in the resultant collision; that if any one of these five elements had been absent the collision would not have occurred; and that the causal relation of each was proximate and not remote.

The railroad contends that the evidence taken alone, or in any event in connection with the four findings of actionable negligence on Baylor's part, eliminates the speed of the train as a causal factor in the collision.

The bus driver was made aware of the approach of the train when he reached a point at least 75 to 100 feet from the track; and any negligence on his part up to that time is eliminated by the jury findings as a contributing proximate cause of the collision. After that, the jury found he might have prevented the collision by (a) reducing the speed below 20 miles per hour, (b) bringing the bus to a complete stop, or (c) turning to the left, instead of (d) trying to beat the train across the track. Since these were alternative preventives, the choice of which was with the driver, his negligent failure to employ any of them constituted each a contributing proximate cause.

Whether (these concurring proximate causes conceded) the negligence of the railroad operatives could constitute an additional concurring proximate cause depends upon whether the evidence will support a finding that such negligence had a direct bearing or influence upon the course of action adopted by the driver after he was apprized of the approach of the train. If the driver misjudged the speed of the train and for that reason did not slacken the speed of the bus below 20 miles per hour, or bring it to a full stop, the negligent speed of the train was a motivating element in the driver's action in this regard; and if thereafter the driver discovered his error in judgment and by reason of his then perilous position two alternatives of escape appeared to him (turn to the left or beat the train across), and he then became confused and excited and chose the latter, the negligence of the railroad was still operative as a contributing proximate cause, in that it actively contributed to the action of the driver in placing himself

in a position where his normal faculties did not properly function. See Gulf, C. & S. F. Ry. Co. v. Wagley, 15 Tex. Civ. App. 308, 40 S. W. 538 (error denied). And this is true, even though the conduct of the driver, tested by the standard of the ordinarily prudent man, did not constitute a complete exoneration from lack of prudence or foresight on his part. Otherwise there could be no such thing in law as a concurring proximate cause.

Since this theory is deducible from the evidence, the jury findings have ample support therein and are not conflicting.

Upon the remaining controlling issues in the case we have reached the following conclusions:

■ The collision and resultant injuries constituted a single, indivisible tort; and since the negligence of Baylor and the railroad each was a contributing proximate cause, the tort was joint, and Baylor and the railroad were joint tort-feasors.

■ We construe the covenant not to sue, coupled with the assignment, as a settlement, release, and extinguishment of the liability of the railroad; and since the tort was single and joint this operated to extinguish the liability of Baylor to the extent of the assignment and the consideration paid therefor. After the assignment there was therefore nothing left of Bradshaw's cause of action except the (not exceeding) $100 (in excess of the $6,500 already paid to Bradshaw by the railroad), which he had reserved from the assignment. The jury finding that $6,500 would fully compensate Bradshaw for his injuries left nothing further for him to recover from Baylor, because he had already received that sum from the railroad, and his entire cause of action was extinguished to that extent, and therefore in full.

These conclusions require some elaboration.

■ Texas decisions accord with the following quotation from 1 Cooley on Torts, p. 277: "The weight of authority will, we think, support the more general proposition, that, where the negligence of two or more persons concur in producing a single, indivisible injury, then such persons are jointly and severally liable, although there was no common duty, common design, or concerted action."

This class of torts is to be distinguished from those in which the injury produced by each is separate from that of the other. In such case each wrongdoer is liable only for the injury done by himself, which rule applies although it may be difficult or even impossible to separate the damage done by each. Sun Oil Co. v. Robicheaux (Tex. Com. App.) 23 S.W.(2d) 713.

The distinction between these two classes of torts is thus clearly drawn by Judge Cooley: "Although it is not always definitely so stated the rule seems to have become generally established that, although there is no concert of action between tort feasors, if the cumulative effect of their acts is a single, indivisible injury, which it cannot certainly be said would have resulted but for the concurrence of such acts, the actors are to be held liable as joint tort feasors; whereas, if the results as well as the acts, are separable, in theory at least, so that it can be said that the act of each would have resulted in some injury, however difficult it may be as a practical matter to establish the exact proportion of injury caused thereby, each can be held liable only for such injury as was caused by his acts." 1 Torts (4th Ed.) p. 279.

■ In this state the rule also prevails that the tort is joint, although the tort-feasors may be liable in different capacities or under different rules of law, as where one is liable as the active wrongdoer and the other by operation of law. See Sproles v. Schepps (Tex. Civ. App.) 26 S.W.(2d) 922; Carmichael Co. v. Miller (Tex. Civ. App.) 178 S. W. 976; Hunt v. Ziegler (Tex. Civ. App.) 271 S. W. 936.

■ The effect of a compromise, settlement or release by one joint tort-feasor upon the liability of another joint tort-feasor has given rise to a diversity of view in some of its aspects. However, "all courts agree that if the consideration paid by one tort-feasor for the release is full compensation for the injury, the other tort-feasor is discharged; but short of this there is a disagreement." 50 A. L. R. p. 1060.

In England and some of the American courts it is held that "a release of one releases all, although the release expressly stipulates that the other defendants shall not be released." 1 Cooley on Torts (4th Ed.) p. 264. Where this rule prevails the only way a settlement can be effected with one joint tort-feasor without releasing the others is through the covenant not to sue, which is generally held not to operate as an extinguishment of the cause of action and therefore not to release the other joint tort-feasors.

In order to avoid circuity of action a covenant not to sue a sole tort-feasor may be set up in bar of plaintiff's action; but in some jurisdictions it is held that the only remedy of one of several joint tort-feasors is to bring suit for breach of the covenant. 1 Cooley on Torts (4th Ed.) p. 266; 58 L. R. A. 299, note. We doubt if this latter rule would be recognized in this state. There is manifestly as much reason for avoiding circuity of action in the one case as in the other.

■ It is now well recognized in this state that settlement may be made with one joint tort-feasor without releasing the others, and it is not necessary to resort to the covenant ·not to sue in order to effectuate this end. A release with such a reservation is given the same effect as a covenant not to sue. El Paso & S. Ry. Co. v. Darr (Tex. Civ. App.) 93 S. W. 166, 167 (error denied); St. Louis, I. M. & S. Ry. Co. v. Bass (Tex. Civ. App.) 140 S. W. 860 (error denied); Cox v. Tel. Co. (Tex. Civ. App.) 13 S.W.(2d) 918. "An injured person can, however, have but one satisfaction for his injuries; the amount paid to the person in whose favor the covenant not to sue is given will be regarded as a satisfaction, pro tanto, as to the joint tort-feasors." 50 A. L. R. p. 1085, and authorities there cited. And the same rule applies to joint debtors. 53 C. J. pp. 1253, 1254, and note 11.

By applying the above principles to the transaction between Bradshaw and the railroad we think there ·is little difficulty in its proper legal analysis. Baylor and the railroad were joint tort-feasors, .and therefore joint principal obligors in a single, indivisible cause of action. The assignment and covenant not to sue was a complete settlement (except as to the reserved $100) of Bradshaw's entire cause of action so far as he was concerned, and nothing remained in him against Baylor or any one else except the reserved $100. And since the amount he received was (as the jury found) full compensation for his injuries, his cause of action was settled in full and thereby extinguished. This principle applies not only in torts but to joint principals in contracts. The particular form of the instrument which the parties executed we think is immaterial. The effect of it was to divest Bradshaw of his entire cause of action (except the reserved $100) and to attempt to vest it in the railroad. This latter he could not do because the railroad was a joint tort-feasor, liable for the entire cause of action, and the vesting in it of the cause of action against Baylor constituted it both obligor and obligee in the same indivisible cause of action, which of necessity extinguished the entire liability. This principle is analogous to the doctrine of "confusion of rights," which is defined as "a union of the qualities of debtor and creditor in the same person. The effect of such a union is, generally, to extinguish the debt." Bouvier's Law Dict.; 12 C. J. p. 499.

The gist of Bradshaw's contention that the assignment to the railroad was valid, even though the latter was a joint tort-feasor with Baylor, is embodied in the following proposition: "Since it is definitely established in the law that a cause of action for personal injuries may be assigned, and since there is no statute or rule of common law prohibiting the assignment of such a cause of action against several wrongdoers to one of the several persons who may be found liable to the injured party, the assignment of such a cause of action to such a person in consideration of the payment of a substantial sum of money to the injured party, by way of compromise, should not be held void as against public policy, for it is the policy of the law to encourage compromise of legal controversies, and a contrary rule would deprive the injured party of the advantage of being able to offer to one joint tort-feasor a partial assignment of his cause of action as an inducement to effect a compromise."

We are cited to no authority which supports this proposition; and it is wholly at variance with our interpretation of well-recognized legal principles.

■ It is a rule of general application that in the absence of statute there is no contribution between joint tort-feasors.

The reasons for the rule (clearly and forcefully stated in 1 Cooley on Torts, pp. 301, 302) are grounded in what the courts have long recognized as salutary principles of public policy; and the rule should be held binding unless and until the Legislature deems it wise to change it. What the law upon such considerations prohibits directly, it should not countenance by indirection. The rule. is ably discussed by Judge Cooley (while on the Supreme Bench of Michigan) in Upham v. Dickinson, 38 Mich. 338, wherein an assignment to a joint tort-feasor was held void. The court say: "The rule is supposed to have an important purpose in keeping parties within the limits of caution and prudence, and making them careful to observe the obligations the law imposes upon them. It is not perceived that there can be any ground for giving such aid indirectly when it would be refused if the demand were presented directly and in the name of the party himself."

Cases are rare in which one tort-feasor has sought (through assignment) to enforce the claim of the injured party against a joint tort-feasor. So far as we have been able to discover, the question, whenever it has arisen, has been decided against the validity of the assignment. Boyer v. Bolender, 129 Pa. 324, 18 A. 127, 15 Am. St. Rep. 723; Tanner v. Bowen, 34 Mont. 121, 85 P. 876, 7 L. R. A. (N. S.) 534, 115 Am. St. Rep. 529, 9 Ann. Cas. 517; Seither v. Traction Co., 125 Pa. 397, 17 A. 338, 4 L. R. A. 54, 11 Am. St. Rep. 905.

The rule that the law favors compromise and settlements of disputes between litigants is no warrant for a practice which in itself is violative of a recognized rule of public policy, merely because in some instances it would enable an injured party to make a more advantageous settlement than he might otherwise be able to make. The general effect of the rule for which Bradshaw contends would be to encourage and prolong litigation in the

interest of those not entitled to the protection of the courts. A joint tort-feasor occupies a most advantageous position to speculate upon the outcome of a suit against his cotort-feasor, and were such practice allowed, it would be the usual thing for a settlement or compromise to assume that form. Moreover, to recognize the right of one tort-feasor to acquire the cause of action against his cotort-feasor would enable the former to escape liability or even reap a profit from an injury to which his own dereliction contributed. If the assignment were upheld in the instant case, it would vest in the railroad every right which Bradshaw originally held against Baylor, and would entitle the railroad to recover from Baylor the full amount it had paid for its own release; and had the jury found that the damage amounted to $26,-500, instead of $6,500, the railroad would have a net profit of $20,000 in the transaction. On the other hand, if Baylor had made its peace with Bradshaw under a like instrument, it would be entitled to the same relief which the railroad (through Bradshaw) now contends for. Thus an incentive would be created for a race between joint tort-feasors as to which might reach the injured party first and obtain an assignment of the cause of action; and for the latter to assume the attitude of auctioneer offering his cause of action against the others to the wrongdoer who would bid the most. The injured party, in many cases, would no doubt profit by such a rule. But it is not the policy of the law to confer benefits upon one class of litigants at the expense of another. The rule contended for could be justified only upon the hypothesis that it was essential to the protection or preservation of the rights of the injured party; which manifestly is not the case, since the law otherwise affords ample protection.

There are, of course, certain classes of cases in which the causal relation to the injury of one joint tort-feasor is manifestly inferior or secondary as compared with that of the other joint tort-feasor. In such cases the law recognizes an equity in favor of the former to be indemnified by the latter to the extent that he may be called upon to compensate the injured party. And the rule against contribution among joint tort-feasors has been modified to a very limited extent in this state by statute. Article 2212.

In either case, however, the law provides its own remedy for the enforcement of the right or equity it recognizes; and it is not left to the will of the injured party whether indemnity or contribution will be allowed. The remedy, in either case, exists independently of any assignment from the injured party; and such assignment can neither detract from nor add to the remedy which the law itself affords, and is in no sense essential to the enforcement of the right or equity which the law recognizes. Nor is the measure of relief the same through an assignment on the one hand, and indemnity or contribution on the other. In the former the recovery would be whatever the injured party would be entitled to; whereas, in the latter only full (in case of indemnity) or proportionate (in case of contribution) recoupment is allowed.

We need not enter into a detailed discussion of the various classes of relations in which it has been held that the right to indemnity does or does not exist. Generally speaking, it is held that where one party commits the tort, and the other is only liable by virtue of some rule of law, or where it can be said that one party is the active wrongdoer, while the other is only passively so, indemnity will be allowed. There are many cases on the subject in this state, but we believe there is none in which indemnity was allowed a party whose affirmative act of negligence at the very time of the injury constituted a contributing proximate cause thereof. The case cited as being most nearly in point is Austin Electric Ry. Co. v. Faust, 63 Tex. Civ. App. 91, 133 S. W. 449, 453. In that case plaintiff recovered a judgment against the street railway and the ice company for injuries inflicted by a runaway team of the ice company; the runaway being caused by a collision between a wagon of the ice company and a car of the street railway company. The ice company by cross-action sought indemnity against the street railway company. A general demurrer to this cross-action was sustained. The Court of Civil Appeals affirmed the judgment as to the plaintiff, but reversed the judgment and remanded the cause as to the cross-action. It is not clear from the opinion just what allegations in the cross-action petition were held to present the issue of active and passive negligence. It does appear, however, that evidence of an admission by the president of the street railway company to the secretary of the ice company that the injury was caused solely by the former company's negligence, and that it was liable both to plaintiff and the ice company, was excluded, and this was held error, as between the two defendants. Writ of error was refused in part and in part dismissed for want of jurisdiction. This was prior to the act of 1913 (page 107, c. 55, § 1) which for the first time conferred jurisdiction upon the Supreme Court in cases where the Courts of Civil Appeals had not rendered final judgment. The refusal of the writ therefore necessarily applied to the judgment in favor of plaintiff which the Court of Civil Appeals affirmed; and the dismissal was a denial of jurisdiction in the Supreme Court to consider the cross-action which the Court of Civil Appeals had remanded to the trial court for further trial. The principle upon which the Court of Civil Appeals rested its judgment of reversal is of unquestioned soundness, name-

ly, that "as to the two negligent parties, if the negligence of one was merely passive, or was such as only to produce the occasion, and the other negligent party was the active perpetrator of the wrong, the former may recover over against the latter." The cases cited in support of this pronouncement (San Antonio v. Smith, 94 Tex. 266, 59 S. W. 1109; San Antonio v. Talerico, 98 Tex. 151, 81 S. W. 518; Kampmann v. Rothwell, 101 Tex. 535, 109 S. W. 1089, 17 L. R. A. (N. S.) 758) all belong to that class in which one of two joint tort-feasors is the actual perpetrator of the wrong, and the other is held liable only by virtue of some rule of law.

We do not regard the Faust Case as authority for the contention that as between Baylor and the railroad the former was the active and the latter only a passive tort-feasor. The active affirmative negligence of each appears from the face of the verdict to have been a proximate contributing cause of the collision. Certainly we cannot say that such is not true as a matter of law; and if the evidence presents the issue of active and passive negligence, it does so only as a fact question which to be availed of should have been determined by the jury. Our views upon the subject of active and passive negligence as applied to the instant case are clearly upheld in Valee v. Joiner (Tex. Com. App.) 44 S.W. (2d) 983, reversing Eastern T. E. Co. v. Joiner (Tex. Civ. App.) 27 S.W.(2d) 917, cited by the railroad.

 As stated, article 2212 modifies the rule against contribution among joint tort-feasors, but to a very limited extent. This article manifests great care in its wording, and evidences a thorough familiarity of its authors with the subject dealt with. By express language its operation is limited to cases in which a judgment has been rendered against two or more joint tort-feasors, among whom no right of indemnity or contribution otherwise exists, and one of them has discharged the judgment. The right of contribution is expressly limited to codefendants, regardless of whether others, not sued, might also be liable. The caption of the original act (Laws 1917, p. 360, c. 152), of unusual brevity and marked clarity and precision, carries the same limitation. It reads: "An Act granting the right of contribution among defendants in judgment in cases arising out of tort and declaring an emergency."

This same limitation is carried into the emergency clause which reads: "The fact that there is now no law in the State of Texas granting the right of contribution between defendants in judgments rendered jointly and severally against such defendants in actions based on tort in which the recovery is had against such defendants as joint tort-feasors, creates an emergency," etc.

In Lottman v. Cuilla, 288 S. W. 123, 126 (opinion by Commission of Appeals), it was said that the act "clearly recognizes the principle of enforced contribution amongst joint tort-feasors, thus changing the common-law rule upon that subject. It is true literally the statute applies to judgments rendered against two or more wrongdoers. But the evident purpose of the act was to relieve the rigor of the common law, so as to place the burden, as amongst themselves, equally upon all the solvent tort-feasors. There is no reason to hold the Legislature meant to exclude from the benefits of the statute those cases where, as here, the plaintiff did not elect to sue all the tort-feasors; but every consideration impels us to hold that the defendant sued may, and should be allowed to, bring in other wrongdoers, provided he does so in such way as not to delay or otherwise prejudice the plaintiff's case."

The question before the court was the correctness of the trial court's judgment sustaining a general demurrer to a cross-plea of defendant seeking to· implead an alleged joint tort-feasor. The statute gives no such right to a defendant tort-feasor; nor does it give a right of contribution other than where judgment has been rendered against two or more. This necessarily means judgment for the plaintiff. A defendant has no right to compel the plaintiff to bring other alleged wrongdoers into his case, and the clear inference of the opinion is that a defendant would not be allowed to implead a joint tort-feasor, to the delay or inconvenience of plaintiff. And suppose the plaintiff objected on the ground of inconvenience, in that it might complicate and confuse the issues in his case, inject other issues in which he was not interested, and thereby prolong the actual trial and increase the cost burden. If this contention were sustained, or if the cross-plea should cause delay in obtaining service, and, on either account, the cross-plea were dismissed, and the judgment went against the defendant, would the latter have the right to pursue the dismissed party in an independent action? If so, is this right limited to those he has sought to implead in the case against him, or is he privileged to sue any one who may be connected with the tort? A number of inconveniences might arise from extending the statute beyond its express wording; whereas, its application to defendants in judgment only can be supported upon reasonable and salutary grounds, the policy of which it was a legislative function to decide. To hold that the statute entirely abrogates the common-law rule against contribution among joint tort-feasors appears to the writer as "a clear instance of unwarranted interference with legislative prerogative" (Speer on Law of Special Issues, p. 419), and this, not in a matter of mere court procedure, but upon a subject of substantive law dealing with an immemorially recognized principle of pub-

lic policy. The decision, if limited to the exact question before the court, would extend the right of a defendant beyond the express limitations of the statute, no further than to authorize the impleading of one joint tort-feasor by a defendant joint tort-feasor, where this may be done without delay or inconvenience to plaintiff; and we would be loath to give the opinion further authoritative effect.

While we have gone somewhat at length into the subjects of indemnity and contribution, because of their relation to the issues between the railroad, as assignee of Bradshaw, and Baylor, the right of the railroad to contribution or indemnity, independently of its rights as assignee, is not involved in the case. As we have shown, the right to indemnity or contribution arose, if at all, as a matter of law because of and at the time the railroad settled with Bradshaw, and this entirely independently of the assignment feature of that settlement. Whatever rights the railroad acquired under the assignment it could assert either in the name of Bradshaw, or in its own as assignee. But whether the suit be brought in the name of Bradshaw or in that of the railroad as assignee of Bradshaw, the recovery could only be had on the Bradshaw cause of action. The railroad might have joined in the Bradshaw suit and in the alternative sought indemnity or contribution, and in that way litigated its right thereto. This it has not done. It appeared as a party to the suit only as a cross-defendant to resist the efforts of Baylor to be reimbursed by way of indemnity or contribution, in case Bradshaw should recover against it.

In the court below Bradshaw joined Union Automobile Insurance Company, as codefendant with Baylor, claiming a direct liability of the insurance company to Bradshaw by virtue of a policy of liability insurance issued by the insurance company in favor of Baylor. The insurance company was dismissed upon a plea in abatement, and Bradshaw has cross-appealed from the judgment in this regard. Since the liability of the insurance company, even if direct, is secondary to and dependent upon that of Baylor, it is unnecessary to consider the issues involved in this cross-appeal.

The trial court's judgment in favor of Bradshaw against Baylor, and in favor of Baylor against the railroad, is reversed, and judgment is here rendered that Bradshaw take nothing against Baylor, and that Baylor take nothing against the railroad. In other respects the trial court's judgment is affirmed.

Reversed and rendered in part, and in part affirmed.

### Upon Motion for Rehearing of Appellee Wesley Bradshaw.

In contesting our holding that the evidence supports the finding that the negligent speed of the train was a contributing proximate cause of the collision, the motion states that "the vital point in determining whether the negligent acts of the driver of the bus were such as to constitute the sole proximate cause of the collision is the detail as to where the bus was when the driver was given warning of the approach of the train." It contends in this regard that Wolf's calculation of this distance as from 75 to 100 feet must be qualified by his further testimony that this was an approximation and that the real distance depended upon where the train could first be seen by one traveling south on the highway, whether that distance be 100, 125, or 150 feet. It further contends that the physical facts, as shown by a map and photographs in evidence, demonstrate that the train could have been seen at a point on the highway 200 feet from the crossing.

While it is true that Wolf's statement of distance was an estimate, it is also true that this estimate was based upon his judgment of the distance both at the time of the occurrence and from observations made by him later in the day when he returned to the scene for the purpose of viewing the physical environs, including this particular point of inquiry. The qualification referred to was elicited on cross-examination, and was nothing more than an admission that there might be an error of judgment on his part. The accuracy of the map was not conclusively established; and Wolf, upon examining it, stated in substance that it did not appear to represent the extent of the curve of the main line of the railroad to the south leading to the trestle. The photographs were taken at a later time when the obstructions to the view by the box car and passenger coach were not shown to be the same as at the time of the collision. Wolf testified that the relative positions of the box car and coach in the map and photographs were not the same as at the time of the collision, in that on the day of the collision the two cars presented a continuous obstruction to the view of one traveling on the highway; whereas, the photographs and map showed a gap between them. A slight change in the degree of curve in the track and in the position of these cars might make a material difference in the distance from the crossing from which one on the highway might see a train approaching from the south on the main line. Wolf's evidence was clearly sufficient to support his estimate of 75 to 100 feet and the physical facts did not necessarily negative this evidence. However, we do not concur with the statement in the motion that this detail is vital to the question of whether the found negligence of the bus driver was the sole proximate cause of the collision.

The motion further contends that the negligence of the railroad could not be

a contributing proximate cause, for the reason that the train operatives could not be held reasonably to have foreseen that the bus driver would pursue the course of action he did in negligently attempting to cross in front of the train. The negligence in the speed of the train consisted in the fact that the train was approaching a heavily traveled public crossing within the city limits of Round Rock. This situation demanded of the train operatives such a reduction in speed as would comport with the safety of those traveling upon the highway, having in view that the train operatives were in charge of an instrumentality which could not be readily brought to a stop when traveling at a high rate of speed; and they were charged in the regulation of the speed at that point with such care as an ordinarily prudent person would exercise, having in view the surrounding circumstances. It would not be unreasonable, we think, to conclude as a matter of fact that such duty of ordinary care would require that the train be kept within reasonable control of the operatives within their line of vision. If such test be a proper one, then it follows that a failure to exercise the care which it imposed would impute to the train operatives a foresight which would embrace the contingency of a collision with some one traveling upon the highway. It was not essential that such foresight should extend to any particular combination of circumstances. The doctrine of foreseeableness is not thus limited in its application.

This view of the negligence in speed stamps it as an active continuing proximate cause and not merely a passive one, when such negligence combined with the negligence of one upon the highway in producing the collision. We think this conclusion is sustained by the recent holding of the Commission of Appeals in Valee v. Joiner, cited in our original opinion, which holding was expressly approved by the Supreme Court.

The other points urged in the motion have, we think, been fully considered in our original opinion. The motion is overruled.

Overruled.